UNITED STATES of America,
Plaintiff-Appellee,

v.

Charles A. JOHNSON, Dennis Lee Lipper, Lawrence Jess Storey, Jr., Jesse Roscoe Storey, Roger Mark Schlager and Brent Harelson, Defendants-Appellants.

No. 77–5327.

United States Court of Appeals,
Fifth Circuit.

July 5, 1978.

---

Carl E. Stewart, Newport Beach, Cal., for Lipper.

James P. Judkins, Tallahassee, Fla., for J. Storey & L. Storey.

William L. Camper, Tallahassee, Fla., for Schlager.

Richard B. Mazer, San Francisco, Cal., John L. Pollok, New York City, for Harelson.

Nickolas P. Geeker, U. S. Atty., Pensacola, Fla., Robert J. Erickson, Joseph S. Davies, Jr., Dept. of Justice, Washington, D. C., for plaintiff-appellee.

Before TUTTLE, MORGAN and CLARK, Circuit Judges.

CHARLES CLARK, Circuit Judge:

The six appellants in this case were named in five counts of an indictment charging them with crimes related to marijuana transactions occurring between July 1971 and December 1974. Count I charged all appellants with conspiracy to import marijuana in violation of 21 U.S.C. §§ 952 and 963. Counts II, III, and IV charged specific substantive acts of importation, violations of 21 U.S.C. § 952(a). Count V charged all appellants with participating in a continuing criminal enterprise, a violation of 21 U.S.C. § 848. At trial Count II was dismissed as to all appellants for failure to prove venue. At the close of the government's case other counts were dismissed as to various defendants. The jury found Charles Johnson guilty on all of the remaining four counts, that is, conspiracy to import marijuana, two substantive acts of importation, and continuing criminal enterprise. Dennis Lipper was found guilty of conspiracy to import marijuana and one substantive count. Larry Storey was convicted only for conspiracy to import marijuana. Jesse Storey was also convicted only of conspiracy to import marijuana. Roger Schlager was convicted of conspiracy to import marijuana and one act of importation. Brent Harelson was convicted of conspiracy to import marijuana and one substantive count. A seventh defendant, Kenneth Vance, was acquitted of conspiracy after all other counts against him had been dismissed.

Many of appellants' arguments relate to the sufficiency of the evidence or to evidentiary rulings made by the trial court. To provide a foundation for our discussion of those arguments, we will first relate the facts in the light most favorable to the government and in some detail. At trial the principal government witness was John de Pianelli, though other witnesses corroborated portions of his testimony. According to de Pianelli, in the late spring of 1971 a mutual friend arranged a meeting between him and Charles Johnson at which the importation of marijuana was discussed. Later in 1971 de Pianelli and Harelson met with Johnson in California to provide the necessary "front" money for a prospective importation venture. At that meeting Johnson explained that through a partner in Colombia he had arranged for the marijuana to be shipped to the United States. They originally thought that the marijuana would arrive in December 1971, but the arrival was delayed until January 1972. Harelson, who was in California, telephoned de Pianelli, in Maryland, to tell him of the new date. Harelson and de Pianelli met Johnson in Pensacola, Florida, after the load of marijuana arrived. The three men drove to Interarity Point, Florida, where Johnson had rented a house, using the name Charles Storey. The rental was confirmed by the testimony of the owner of the house. After receiving their shares of the marijuana, de Pianelli and Harelson drove to Maryland where they distributed the marijuana. Later de Pianelli was told that Lipper and Roger Schlager also received shares of this marijuana.

In the spring of 1972, de Pianelli and Harelson once again met with Johnson in California and gave him additional front money to finance a second importation of marijuana. Later, Harelson telephoned de Pianelli from California to confirm the date for the arrival of the marijuana. de Pianelli and Harelson met in Tallahassee, Florida, and drove to the Interarity Point house where Lipper, Schlager, George Driver, David Barca, and Johnson were already present. de Pianelli recalled that he arrived about five days before hurricane Agnes struck the coast, on June 19. Johnson explained that the load of marijuana was on the way from South America by boat but that it was to be delivered about nine miles away at a house which he had rented in Orange Beach, Alabama, because of his fear that repeated usage of the Interarity Point house would attract attention. During the wait for the marijuana to arrive, de Pianelli also discussed the timing of the arrival and the kind of marijuana with Lipper, Schlager, Harelson, Driver, and Barca.

de Pianelli and Harelson drove to the house at Orange Beach to await the arrival of the marijuana. Some days later, in the early afternoon, de Pianelli saw a skiff coming toward the Orange Beach residence. de Pianelli and Harelson helped to pull the skiff ashore, moor it, and cover it. On the skiff were J. Moen, Gary Smith, and Gary Vance. Moen told Harelson and de Pianelli that they had come from South America on board a vessel named "Decatur," which was captained by Larry Storey, Sr., and had a crew of one or both of his sons, Larry Storey, Jr., and Jesse Storey, and Mathew Moen. After the skiff used to make the run to shore had been hidden, the men drove to the Interarity Point house to inform Schlager, Lipper, Barca, and Driver of the boat's arrival.

That night the men drove back to the Orange Beach house to unload the skiff. While Johnson supervised the weighing and allocation of the marijuana, everyone else helped in unloading the marijuana, most of which was packed in burlap bags. After the marijuana had been separated, Johnson told Schlager, Lipper, Driver, Harelson, and de Pianelli that there would soon be another importation. The individuals then left to distribute the marijuana.

As support for de Pianelli's testimony the government introduced aerial photographs of the house at Interarity Point. de Pianelli testified that he recalled a plane flying low over the house while they were there. He also identified the vehicles in the photograph as belonging to Johnson, Schlager, Lipper, and Moen.

Later in the summer de Pianelli met with Johnson in California to give him additional front money to finance another shipment of marijuana. In December 1972, de Pianelli and Harelson went to Crawford's Fishing Camp near St. Marks, Florida, where Johnson had told Harelson he would meet them. The owner of the camp testified that he rented it to Charles Storey for the month of December 1972. Schlager and Lipper were at the fishing camp when de Pianelli and Harelson arrived; Johnson, Driver, Barca, and J. Moen arrived later. Johnson asked de Pianelli and Driver to go to Pensacola and return with the skiff which had been modified since its use in bringing the marijuana ashore at Orange Beach. In the interim it had been repainted at a boatyard and fitted with a larger gas tank. de Pianelli recalled that the boatyard owner's name was Blanchard. Blanchard later testified that Charles Storey had brought the skiff to his boatyard and had requested certain modifications. When asked if he could identify Charles Storey in the courtroom, Blanchard pointed to Charles Johnson. Blanchard also identified the piece of paper on which the modifications had been drawn by the man claiming to be Charles Storey. Blanchard's records showed that the boat had left on December 18, 1972, without the modifications being completed. The owner of a marina at St. Marks identified the same boat as the one moored by Charles Johnson at the marina from December 1972 through August 1973. This marina owner also correctly identified Charles Johnson at the trial. Both marina owners had records that listed the address of the house on Interarity Point which Johnson had rented as the address of the owner of the boat.

After the skiff arrived at St. Marks, Schlager and Lipper took it out into the Gulf of Mexico on several nights in an effort to contact a vessel, the Aurora, carrying the marijuana. Lipper and Schlager discussed their intentions with Harelson, Barca, and Driver as well as with de Pianelli. While they were at Crawford's Fishing Camp they often discussed the fact that the marijuana was coming from Colombia, which they anticipated would assure a high quality. About ten days after de Pianelli's arrival at St. Marks, Schlager and Lipper returned with the marijuana. de Pianelli related how he and the others formed a human chain to unload the bales of marijuana from the skiff. Again the marijuana was weighed, using the same scale as at Orange Beach, and distributed among the various men.

The owner of a marina at Alligator Point, southwest of St. Marks, testified that the

Aurora had been docked at his marina from December 1972 to April 1973. In court, he identified Dennis Lipper as the man who had been the captain of the boat. He explained that he was told that Charles Johnson owned the boat, though he could not identify him in the courtroom. He also testified that the men on the boat once told him that they were taking it to St. Marks. The owner of a marina at St. Marks identified Johnson as the man to whom he had sold gasoline in December 1972.

In the spring of 1973, Johnson, Lipper, Schlager, and de Pianelli met at the house at Interarity Point to discuss yet another shipment of marijuana. Johnson explained that between five and six thousand pounds of marijuana was in storage in Colombia and that J. Moen was making the necessary arrangements to send it by ship from Colombia into the Gulf of Mexico where it would be transferred to another vessel for transportation to the United States. Captain Storey and his two sons were to be the initial crew and to help transfer the marijuana from one vessel to another. Again de Pianelli provided front money for this load of marijuana.

Later in 1973 Johnson, Schlager, Lipper, and de Pianelli met in Fort Lauderdale. At these meetings Johnson explained that Moen was having difficulties in Colombia. During the ten months which passed before the marijuana arrived, Johnson and de Pianelli had several discussions in which the Storey brothers and their father were mentioned. At Johnson's request, de Pianelli furnished an additional $16,000 to finance the purchase of a boat needed to complete arrangements. Johnson purchased a yacht, the Altair, from a boatyard in Fort Lauderdale. Johnson, Lipper, Schlager, and de Pianelli sailed on the Altair to Key West where they remained for about three weeks. During this time Johnson telephoned Captain Storey in Colombia to discuss the plans for shipping the marijuana.

The four men left Key West and sailed to the island of Cozumel off the Yucatan Peninsula where they stayed for several months. Johnson explained that the delay was caused by difficulties with agents in Colombia and by attempts to acquire additional marijuana. Before the load was shipped from Colombia, de Pianelli left Cozumel and flew to Tampa where he met his wife. They drove to a house which Johnson had bought on St. George Island in Florida where, from discussions with Johnson, Lipper, and Schalger, de Pianelli expected the load would arrive. When they arrived at St. George Island, J. Moen and Roger Schlager were already there. de Pianelli and Schlager discussed the delay in the arrival of the marijuana from Colombia. Due to a shortage of money, however, de Pianelli left St. George Island, and drove to Washington, D. C., to get additional money. He drove immediately back to Florida.

Enroute to Florida de Pianelli telephoned the house at St. George Island. Johnson answered and told de Pianelli that the load had arrived. de Pianelli rented a U-Haul trailer in Panama City, Florida, and drove directly to the house on St. George Island. The receipt for the rental was introduced at the trial to show that de Pianelli had rented the trailer on November 10, 1973. When he arrived de Pianelli was told by Johnson that Schlager, Lipper, and Moen had already left with their shares of the marijuana. After Johnson and de Pianelli loaded the rented trailer, de Pianelli left for Washington. de Pianelli received more marijuana than he had already purchased. When he left for Washington he owed Johnson about $156,000 for the additional marijuana. Three weeks later de Pianelli returned to St. George Island to repay part of this debt. At that time Larry Storey was present and related the difficulties which he had encountered in transporting the marijuana from Colombia.

In addition to de Pianelli's testimony concerning the events at St. George Island, the government presented the previous owner of the house, who pointed to Johnson and identified him as the man to whom he had sold the house.

In January 1974, de Pianelli met Johnson at a motel in Santa Barbara, California. Johnson demanded payment of the balance

that de Pianelli owed him from the St. George Island shipment. de Pianelli did not comply. Three days later Johnson returned with Bill Lawrence. Lawrence testified that he had been hired by Johnson to help collect the debt. At his first meeting with Johnson, Lawrence was told that de Pianelli owed the money from a marijuana transaction. Larry Storey, who Lawrence identified in the courtroom, and Captain Storey were present at that first meeting. Johnson and Lawrence attempted to detach the trailer from de Pianelli's car and to attach it to Johnson's vehicle. Upon being asked the reason for his conduct, Johnson responded that he was taking the trailer as payment for the money owed him. Johnson, Lawrence, and de Pianelli then went into de Pianelli's motel room to discuss the debt. Captain Storey and Larry Storey were also present. In an attempt to coerce de Pianelli into paying the debt, Johnson had Lawrence begin hitting and kicking de Pianelli. During the time that Lawrence was beating de Pianelli, Larry Storey encouraged him, agreeing with Johnson that de Pianelli should be killed. The dispute over the debt was temporarily resolved when de Pianelli's father-in-law agreed to sign a note promising to pay the money to Johnson.

Lawrence, who continued to work for Johnson, testified that he, along with Lipper and J. Moen, was to meet at the St. George Island house. When Lipper and Moen arrived at the house, however, they discovered that law enforcement officials had the house under surveillance. As a result, a further proposed importation to the St. George Island house was cancelled. Johnson later told Lawrence that the load was sold somewhere else.

In addition to the testimony already described, the government introduced the testimony of law enforcement officials who had observed various houses which were used during the transactions. One such witness described the vehicles which he saw at the Interarity Point house in April 1973. Among the vehicles were two motor homes. One was shown to be registered to Dennis Lipper; the other was registered to Robert Schlager (Roger Schlager's brother). Another agent testified that he had observed the boats described by de Pianelli at various marinas during the period from January 1973 to April 1973. In April 1973 he followed Johnson and Lipper while they worked on a boat in the vicinity of St. Marks. A third agent related his observations of the house owned by Johnson on St. George Island between October and December of 1973.

 Johnson was sentenced to a total of twenty years in prison: five years on Count I for conspiracy to import marijuana; five years on each of two counts of intentional importation; and ten years for continuing criminal enterprise. The sentences on the substantive counts were to run concurrently; the sentences for conspiracy and for the continuing criminal enterprise were to be consecutive sentences. Johnson argues that the imposition of consecutive sentences for conspiracy to import marijuana and for engaging in a continuing criminal enterprise is prohibited by *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977). The government concedes that those consecutive sentences were improper. Since conspiracy to import marijuana is a lesser included offense to engaging in a continual criminal enterprise, Johnson's conviction for conspiracy must be vacated.

Without conceding that there was sufficient evidence to convict him on any of the other counts, Johnson concentrates his argument on his conviction under section 848. That section provides:

(a)(1) any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 10 years and which may be up to life imprisonment, to a fine of not more than $100,000, and to the forfeiture prescribed in paragraph (2); . . .

(b) For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—

(1) he violates any provision of this subchapter or subchapter II of this

chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

Johnson does not contend that the government failed to prove that he obtained substantial income from his continuing criminal enterprise. Instead, he focuses his attack on the provision in section 848(b)(2)(A) which requires that for a person to be engaged in a continuing criminal enterprise he must act "in concert with five or more other persons" and with respect to those persons he must occupy a "position of organizer, a supervisory position, or any other position of management." Johnson's argument is divided into five parts.

The first two parts of Johnson's argument are based on the contention that in pretrial procedures the government misled him about the proof that it would introduce at trial. In particular, Johnson contends that though the indictment was obtained on a theory that he managed five persons other than his codefendants, the proof at trial showed that Johnson managed his codefendants. Johnson contends that this variance amounted to an amendment which was prejudicial in itself and that it was a material variance which led to prejudice. His second argument is that there was a prejudicial variance between a bill of particulars rendered by the government and the proof at trial concerning the identity of the five or more persons whom Johnson was alleged to have supervised. Johnson contends that he was misled because the bill of particulars caused him to believe that the government would not attempt to prove that Johnson managed his codefendants. As a result, Johnson neither asked his codefendants to testify nor requested a severance. The government responds to both of these arguments by emphasizing that the indictment was returned in general terms, in fact, in the words of the statute. As a result, the government could provide specifics without amending the indictment. The government further argues that Johnson was not prejudiced since in pretrial proceedings it told Johnson that it would show that he had managed others than his codefendants.

The discussions in those pretrial proceedings related to the original indictment, which was returned on January 18, 1977, and a superseding indictment, which was filed on March 10, 1977. Count V of both indictments charged a continuing criminal enterprise as defined by 21 U.S.C. § 848. The original indictment named twelve persons in Count V: the seven defendants who were tried together and five other persons. The superseding indictment deleted from Count V the names of four persons who were not defendants and who throughout the proceedings have been referred to as the "Spanish-surnamed individuals."

During one pretrial conference the parties debated whether the government should be required to name the five or more individuals who the government would prove were supervised. The trial judge agreed with the defendants that the government should supply additional information. In response to the court's request, Clifford Davis the Assistant United States Attorney responsible for the prosecution, said, "I can go this far, to say there are four people alleged in the indictment at this point not contained in that Count and that those four would be people who would be organized or supervised by the seven named in Count V, and in addition there would be other people that are not named in the indictment." Davis' indication that the four Spanish-surnamed individuals might be included among those who were supervised created additional problems in the minds of the attorneys for the defendants. Those problems arose primarily because the Spanish-surnamed individuals were fugitives and were not available as witnesses at

the trial. After further attempts by the defendants to learn the identity of the supervised persons, Davis responded to the court, "I said that they [the Spanish-surnamed individuals] are among the five that are required, the at least five that would have to be proven. There may be five without them, there may be three of those and two more." After Davis had supplied that information, the court stated that it would grant no more motions for a bill of particulars.

Throughout these pretrial proceedings and, in fact, throughout the presentation of its case, the government proceeded on the theory that it could show that each of the seven defendants on trial was an organizer of five or more other people. At the close of the government's case, however, the trial court dismissed Count V against all defendants except Johnson, because the government had failed to prove that the other defendants had acted in a supervisory capacity. In his closing argument Davis suggested to the jury that the government had shown that Johnson had supervised five or more other persons. Never during the trial were the four Spanish-surnamed individuals mentioned. Thus, for there to be sufficient evidence to convict Johnson under section 848, there must be evidence that he organized, supervised, or managed five or more persons other than the Spanish-surnamed individuals. The sufficiency of the evidence is dealt with later. At this point, we consider only whether there was a prejudicial variance between the indictment and the proof at the trial or between the bill of particulars and the proof at the trial.

■ In *United States v. Fischetti,* 450 F.2d 34, 39 (5th Cir. 1971), *cert. denied,* 405 U.S. 1016, 92 S.Ct. 1290, 31 L.Ed.2d 478 (1972), this court explained the importance of the indictment:

> An indictment is required to set forth the elements of the offense sought to be charged . . . in order to sufficiently apprise the defendant of the charge he must be prepared to meet and to prevent him from being charged with the same crime in the future. If, therefore, an amendment goes to an essential element of the crime, it is a substantial change and cannot be made except by resubmission to the grand jury . . . . .

We explained the nature of a prejudicial variance which requires reversal in *United States v. Lambert,* 501 F.2d 943, 947 (5th Cir. 1974) (en banc), saying, "If an indictment alleges particular facts as constituting an element of a charged crime, there is a variance if the trial judge admits evidence that makes out this element in a different manner." Here the indictment was sufficient because it charged in the words of the statute that Johnson and others had engaged in a continuing criminal enterprise. *See, e. g., United States v. Strand,* 566 F.2d 530, 534 (5th Cir. 1978). The proof at trial was directed toward demonstrating that the elements of that crime, as defined in section 848(b), had occurred. In particular, the proof showed that there were five or more persons who had been managed by Johnson. There was thus no variance between the indictment and the proof at trial.

■ A bill of particulars amplifies the indictment by providing additional information. As we said in *United States v. Martinez,* 466 F.2d 679, 686 (5th Cir. 1972), *cert. denied sub nom. Berman v. United States,* 414 U.S. 1065, 94 S.Ct. 571, 38 L.Ed.2d 469 (1973), "The purposes of a Bill of Particulars are to inform the defendant of the nature of the charge against him with sufficient precision to enable him to prepare his defense, and to avoid or minimize the danger of surprise at trial." In *United States v. Horton,* 526 F.2d 884, 887 (5th Cir.), *cert. denied,* 429 U.S. 820, 97 S.Ct. 67, 50 L.Ed.2d 81 (1976), we explained that "where a fatal variance is argued, appellant must demonstrate that he was taken by surprise by reason of the variance and that such surprise prejudiced the preparation of his defense." As the quotations from the pretrial conference demonstrate, the defendants were not told that the five or more persons would be comprised of the codefendants plus others. Instead, they were told that the five or more persons would be made up from a group comprising

the four Spanish-surnamed individuals as well as other persons unnamed at that time. Thus, there was no variance between the bill of particulars and the proof at trial. Since there was no variance, the defendants could not have been prejudiced. The defendants cannot claim to have been surprised or misled by Davis' comments during the pretrial conference.

Johnson's third argument is also directed toward the bill of particulars. The basis for that argument lies in the discussion during pretrial conferences of the violations which the government would use to show that there was a continuing criminal enterprise. Those discussions were necessitated by the fact that courts have required that a minimum of three illegal acts be proved to establish a continuing criminal enterprise. *E. g., United States v. Bergdoll,* 412 F.Supp. 1308, 1317 (D.Del.1976). The defendants requested that the court order the government to provide the dates of each of those occasions. In complying with that request, Davis indicated that Counts II, III, and IV of the indictment, the substantive counts, constituted three occasions. He indicated that in addition there would be proof of an incident on January 10, 1971, at Interarity Point. Later in this same conference, which was held on April 14, 1977, the government attorney again mentioned the date as being 1971. Four days later, on April 18, the day of the trial, the trial court allowed the government to amend its statement so that the date of the violation was January 10, 1972. Although counsel for defendants objected to the allowance of this amendment, they made no motion for a continuance.

■ It is a well settled rule that a bill of particulars "may be amended at any time, and the decision to allow an amendment is within the discretion of the trial court, which decision will be reversed only on a showing of prejudice or clear abuse of discretion by the trial court." *United States v. Perez,* 489 F.2d 93, 95 (5th Cir. 1974). *See also United States v. Sherriff,* 546 F.2d 604, 606 (5th Cir. 1977). In an attempt to show that he was prejudiced, Johnson contends that his trial counsel had thoroughly investigated the date in 1971 and had found at least one witness who would testify that Johnson was somewhere other than at Interarity Point on that date. In addition, he contends that his counsel was prejudiced in his cross-examination of de Pianelli, because he began by thinking that he could cross-examine on the 1971 date.

■ Johnson has failed to demonstrate any actual prejudice from this change and he has failed to demonstrate any abuse of the district court's discretion. The 1971 date was outside the dates charged in the indictment. In addition, in an analogous situation, when a conspiracy is alleged the government is not limited to proving at trial only those overt acts which it has stated either in the indictment or in the bill of particulars. Thus we have held that it is not prejudicial for the government to show other acts of the conspirators occurring during the life of the conspiracy. *United States v. Perez,* 489 F.2d 51, 70 (5th Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). In the absence of an abuse of discretion or of demonstrated prejudice, there was no reversible error.

■ Johnson's fourth argument is that it was error for the trial court to fail to define the terms in section 848 such as "organizer, supervisor, or other position of management" and "substantial income." Johnson argues that this superficially simple statute is actually very complex, therefore requiring careful instructions for the jury to avoid prejudice to a defendant. Johnson also urges that in the prosecutor's closing argument he misstated the criteria involved in proof of a violation of section 848. In particular, Johnson contends that it was improper for the prosecuting attorney to refer to the statute as the "King Pin Statute." Although Johnson argues that the words of the statute are vague, this court has held in *United States v. Cravero,* 545 F.2d 406 (5th Cir. 1976), *cert. denied,* 430 U.S. 983, 97 S.Ct. 1679, 52 L.Ed.2d 377 (1977), that section 848 is not unconstitutionally vague on its face. The words and phrases in the statute are neither outside

the common understanding of a juror, *see United States v. Crockett,* 506 F.2d 759, 762 (5th Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975), nor so technical or ambiguous as to require a specific definition, *see Evans v. United States,* 349 F.2d 653, 658 (5th Cir. 1965). Thus none of them required definition by the trial court. Although situations might exist which would indicate that a jury should be aided by definition of the words in this statute, it was not error to refuse to do so in the straightforward context of this case.

The prosecutor did not misstate the nature of the statute by using the term "King Pin." This court and others have used the same term to describe the statute. *E. g., United States v. Bolts,* 558 F.2d 316, 320 (5th Cir.), *cert. denied sub nom. Hicks v. United States,* 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977); *United States v. Sperling,* 506 F.2d 1323, 1344 (2d Cir. 1974), *cert. denied,* 420 U.S. 962, 95 S.Ct. 1351, 43 L.Ed.2d 439 (1975). Moreover, the definition of "King Pin" in Webster's Third New International Dictionary shows the aptness of the term: "One that holds a chief or most prominent place in a group or undertaking."

Johnson's fifth argument is that there was insufficient evidence to convict him of a violation of section 848. He divides this point into two parts. First, he argues that there was insufficient evidence to show that he was an organizer, supervisor, or manager. Second, he contends that there was insufficient evidence to show that there were five or more supervised persons. As to the first point, he contends that there was no evidence that he had directed or orchestrated the activities of anyone. He interprets the evidence as showing only that all of the codefendants were working together and that Johnson had not occupied a position of superiority. To support that interpretation he quotes a portion of de Pianelli's testimony in which he stated that nobody elected themselves president of the operation. For the second point, Johnson contends that there was no evidence which demonstrated his relationship to the other defendants. The only evidence, according to Johnson, is that de Pianelli occupied an inferior position to Johnson. From this, Johnson contends, one cannot conclude that all of the other defendants occupied an inferior position.

During the trial there were at least six other persons who were named as acting in concert with the codefendants. These persons were de Pianelli himself, Captain Storey, J. Moen, David Barca, George Driver, and William Lawrence. Thus, even excluding the codefendants from the computation, it is apparent that the government proved there were five or more other persons involved in this criminal activity. The government also proved that Johnson acted in a supervisory, managerial, or organizing capacity with respect to these five or more other persons. For each transaction Johnson accumulated front money to finance the importation. Johnson related his contacts with people in Colombia who would sell the marijuana and who would transport the marijuana into the Gulf of Mexico. Johnson was responsible for purchasing or renting houses and boats to facilitate the importation of the marijuana. And he acted as a general coordinator of the activities at each place of importation. The evidence may not show that Johnson conducted the activities with the regimentation of a G3 Section in the United States Army, but it does show that he organized, supervised, and managed the activities of other persons. Or, in the words of de Pianelli, everyone involved assumed that "Mr. Johnson was our leader."

Johnson's final argument is that because of the ineptitude of his appointed counsel he was denied the effective assistance of counsel. He divides his contention into two parts. First, he contends that his counsel, Phillip Stein, had a conflict of interest, which was apparent to the court after de Pianelli testified that he had sent money to Stein to hold in escrow for Johnson to use to purchase a boat. Johnson now argues that Stein's first concern was to protect himself and that the pre-eminence of that concern was demonstrated when Stein's first questions on cross-examination of de

Pianelli related to whether they had ever met. Johnson further argues that Stein was a potential witness on Johnson's behalf who would testify concerning de Pianelli's threats against Johnson. Thus, Johnson concludes, the trial judge ought to have inquired about this conflict of interest and Stein should have withdrawn from the case.

The second portion of Johnson's contention is that Stein's trial technique was inept and incompetent. He points to two general areas. First, he contends that Stein's opening statement showed a failure to investigate because he contended that de Pianelli was a regular user of LSD whose testimony would be shown to be merely a figment of his imagination. In addition, he told the jury that de Pianelli was a former actor who enjoyed creating fictional plots. Stein's incompetence was allegedly shown during trial when he failed to ask de Pianelli about his use of LSD and when he received unexpected answers concerning de Pianelli's prior role as an actor. As a result, Johnson now argues, Stein's closing argument was different from his opening statement, thus creating prejudice in the minds of the jury. The second trial technique which Johnson contends was inadequate was Stein's cross-examination of de Pianelli. For specific examples, Johnson contends that Stein did not know the procedure for impeaching a witness with a prior inconsistent statement, that he did not know the relevant facts and therefore asked irrelevant questions, that he asked questions to which he did not know the answers, thus leading to disaster, that he could not control de Pianelli, thus allowing him to volunteer damaging evidence, and that he asked questions which incorrectly assumed that Johnson was present at various occasions. Johnson concludes by arguing that the trial court was aware of all of these shortcomings.

At the outset of this analysis, we would observe that it appears anomalous for Johnson to base the other five contentions on appeal upon grounds raised by Stein during the trial. Thus Johnson while asserting Stein's ineptness also demonstrates that Stein was effective enough to preserve at least five grounds for error on appeal. This inconsistency, however, is not the basis for our decision.

■■■■ The standard for measuring the performance of trial counsel is reasonably effective assistance. As this court has repeatedly stated, this standard does not require errorless counsel. *E. g., United States v. Carter,* 566 F.2d 1265, 1272–73 (5th Cir. 1978). An examination of the entire record discloses that Stein provided reasonably effective counsel. Stein's initial questions to de Pianelli may be seen as an attempt to persuade the jury that he was not associated with de Pianelli, not to protect himself but to enhance his effectiveness with the jury as Johnson's representative. That was a reasonable trial tactic under the circumstances and an equally plausible explanation of his actions. Johnson was entitled to have counsel of his choice and that selection could include a lawyer with whom he had prior dealings. The evidence concerning de Pianelli's threats to Johnson was given by an Internal Revenue Service agent. Thus there was no need to call Stein as a witness to establish this fact. On cross-examination, counsel for defendant Lipper asked de Pianelli about his use of LSD; de Pianelli admitted that he had used LSD at least fifty times in the past five or six years. de Pianelli also admitted on cross-examination by other defendants' counsel that he had once been associated with theatrical groups. We are not persuaded that any prejudice arose. Moreover, whatever prejudice may be contended to have arisen from the difference between Stein's opening remarks and his later cross-examination was eliminated by the questioning of co-counsel.

Stein's cross-examination of de Pianelli, though it may not have been of textbook quality, does not permit us to conclude that Johnson was denied reasonably effective assistance of counsel. de Pianelli proved to be a difficult witness to examine for the government counsel as well as for all defense counsel. That Stein could not control de Pianelli was a problem he shared with all

counsel at the trial. Furthermore, Stein filed numerous pretrial motions, made repeated objections at trial, and generally made his presence effectively felt in the conduct of the trial. The lengthy record amply demonstrates that Johnson was not denied effective assistance of counsel.

In summary, we affirm Johnson's conviction on two counts of knowing and intentional importation of marijuana and we affirm his conviction for continuing criminal enterprise. We vacate his conviction for conspiracy to import marijuana.

The next appellant, Dennis Lipper, raises four points in his brief on appeal. He first argues that it was improper to permit de Pianelli to testify as an expert concerning the origin of the marijuana. Appellants concede that the substance with which they were dealing was marijuana. They contend, however, that there was no objective evidence showing that the marijuana was imported from outside the customs territory of the United States. Since no marijuana was ever seized, the only nonhearsay evidence concerning the origin of this marijuana came from de Pianelli. When de Pianelli was first asked to state whether the marijuana had come from Colombia, counsel for defendants objected. The jury was then excused and de Pianelli was examined on voir dire and cross-examined by defense counsel. During voir dire, he admitted that he had smoked marijuana over a thousand times and that he had dealt in marijuana as many as twenty times. He also said that he had been asked to identify marijuana over a hundred times and had done so without making a mistake. He based his identification upon the plant's appearance, its leaf, buds, stems, and other physical characteristics, as well as upon the smell and the effect of smoking it. On cross-examination he stated that he had been called upon to identify the source of various types of marijuana. He explained that characteristics such as the packaging, the physical appearance, the smell, the taste, and the effect could all be used in identifying the source of the marijuana. It was stipulated that he had no special training or education for such identification. Instead, his qualifica-

tions came entirely from "the experience of being around a great deal and smoking it." He also said that he had compared Colombian marijuana with marijuana from other places as many as twenty times. Moreover, he had seen Colombian marijuana that had been grown in the United States and had found that it was different from marijuana grown in Colombia.

After the voir dire examination, the defendants objected to de Pianelli's expertise for lack of authentication that he had actually smoked it, touched it, or correctly identified it. Despite the objection, the trial court permitted de Pianelli to give opinion evidence. Before the jury he related his experiences with marijuana and explained that he had tested a sample of marijuana from each importation and had verified that it came from Colombia.

Lipper contends that the source of marijuana is not a matter requiring expert opinion and that there was no foundation for de Pianelli's testimony. Lipper further contends that it was an error to qualify de Pianelli as an expert because he had never been to South America and, of course, had never smoked marijuana there or seen it growing in South America. Finally, Lipper contends that de Pianelli's testimony was conclusively rebutted by an associate professor of biological science at Florida State University, Loren C. Anderson.

In *Crawford v. Worth,* 447 F.2d 738, 740–41 (5th Cir. 1971), we stated the principle which guides appellate review of trial court determinations concerning expert testimony:

The federal rule regarding review standards of trial court rulings on expert opinion evidence is stringent. " * * * the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." *Salem v. United States Lines Co.,* 370 U.S. 31, 82 S.Ct. 1119, 8 L.Ed.2d 313, . . In this Circuit's terms: "The expert qualification of a witness is a question for the trial judge, whose discretion is conclusive

unless clearly erroneous as a matter of law." *United States v. 41 Cases, More or Less,* 420 F.2d 1126 (5th Cir. 1970). "If the question is one which the layman is competent to determine for himself, the opinion is excluded; if he reasonably cannot form his own conclusion without the assistance of the expert, the testimony is admissible." *Steinberg v. Indemnity Insurance Company of North America,* 364 F.2d 266, 274 (5th Cir. 1966). The Ninth Circuit has expressed a similar principle in these words:

> To warrant the use of expert testimony, two elements are required. First, the subject of the inference must be so distinctly related to some science, profession, business or occupation as to be beyond, the knowledge of the average layman, and second, the witness must have such knowledge or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth.

*Fineberg v. United States,* 393 F.2d 417, 421 (9th Cir. 1968).

 Here the subject of the inference, the source of the marijuana, is related to the occupation of selling illegal drugs and to the science of botany, neither of which is likely to be within the knowledge of an average juror. For the government to obtain a conviction it was necessary that it prove that the marijuana came from outside the customs territory of the United States. *See* 21 U.S.C. § 952. Testimony which would identify the source of the marijuana would be of obvious assistance to the jury. It was therefore proper for the trial court to consider whether de Pianelli was qualified to provide such testimony.

 Rule 702 of the Federal Rules of Evidence provides that expertise may be obtained by experience as well as from formal training or education. de Pianelli's testimony during voir dire revealed that his substantial experience in dealing with marijuana included identification of Colombian marijuana. In light of that testimony, the trial court was within its discretion in deciding to admit the testimony for the jury's consideration.

 The introduction of testimony from an expert witness does not foreclose the issue from consideration by the jury, which need not accept the expert's testimony. A defendant is free to introduce his own expert to challenge the prosecution's witness. Here the defense introduced the testimony of Professor Anderson, who said that it was impossible to determine the origin of a particular sample of marijuana by examining its physical characteristics. The trial court instructed the jury in general terms concerning the weight it should give to testimony. In addition, it specifically instructed the jury regarding expert witnesses and concluded with this admonition: "You should consider such expert opinion received in this case and give it such weight as you think it deserves." Thus the conflict between the experts was correctly presented to the jury for resolution. *Cf. United States v. Bermudez,* 526 F.2d 89, 98 & n.8 (2d Cir. 1975), *cert. denied,* 425 U.S. 970, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976).

The only remaining challenge to de Pianelli's status as an expert is the argument that no one can acquire the skill which he professed to have. That objection may be rephrased in the words of this court in *International Paper Company v. United States,* 227 F.2d 201, 205 (5th Cir. 1955): "an opinion is no better than the hypothesis or the assumption upon which it is based." If the hypothesis is proved to be flawed, the witness should not be allowed to testify. This type of objection would be directed at, for example, the testimony of someone purporting to tell the color of a person's hair from fingerprints or the use of a testing device that had not been generally accepted by the scientific community. For a discussion of the latter problem, see *United States v. Brown,* 557 F.2d 541, 554–59 (6th Cir. 1977). Neither at trial nor on appeal have the appellants directly argued that no one can distinguish marijuana that has been grown in Colombia from other marijuana. They have, however, done so implicitly, and we believe that they tried to do so through the testimony of Professor Anderson. We shall therefore briefly consider that objec-

**1362**

tion as well. *Cf. United States v. Brown, supra,* 557 F.2d at 557 n.17.

■ On the record before us we cannot say that the claim of an ability to identify Colombian marijuana is so inherently implausible that, as a matter of law, a jury should not be permitted to hear testimony on the identification. de Pianelli claimed that he could identify Colombian marijuana. Professor Anderson disputed that claim. But Professor Anderson admitted that climatological differences could produce differences in the marijuana plants. Professor Anderson's testimony was based upon the lack of scientific tests which would demonstrate that marijuana grown in Colombia differed from that grown elsewhere. Tests had shown, however, that marijuana grown in Canada differed from marijuana grown in other locations. Thus, there was some ambiguity in Professor Anderson's testimony. The issue was one that could have been resolved by the jury. In allowing the jury to consider the question and to hear the same arguments counsel now make to us, the trial court did not err.

Lipper's second argument is similar to Johnson's argument concerning bills of particulars. Lipper contends that it was prejudicial to refuse motions for bills of particulars and to permit amendment of the bill of particulars.

■ We have already explained that it was not prejudicial to permit amendment of the bill of particulars to change the date from 1971 to 1972. Lipper adds a challenge to the trial court's refusal to require the government to reveal the time, date, place, and participants in any overt act which the government intended to use to prove the conspiracy, the date and place each conspirator joined the conspiracy as well as the time during which he was a participant, and the names of all witnesses. Lipper contends that it was impossible for the defendants to be prepared to defend their actions over the four-year period charged in the indictment. Finally, he contends that he was surprised by the change in the date in the bill of particulars and by Lawrence's testimony. The function of a bill of partic-

ulars is to inform the defendant of the nature of the charges against him, not "to obtain a detailed disclosure of the government's evidence prior to trial." *United States v. Perez,* 489 F.2d 51, 71 (5th Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). Lipper has shown no actual prejudice from the judge's rulings and in the absence of such a showing there can be no reversible error.

■ Lipper's third contention is that it was erroneous to admit the testimony of the various law enforcement agents concerning their surveillance of the houses and other activities of defendants. Lipper bases his argument upon Rule 403 of the Federal Rules of Evidence, contending that the prejudicial effect of the evidence was greater than its probative value. He contends that the dates of the surveillance do not correspond with the particular criminal activities otherwise asserted and that there was nothing inherently suspicious about the fact that these defendants were gathered at one site at the same time. As a result, he contends, the jury was permitted to string together a series of inferences to reach their verdict of guilty. Lipper provides the answer to his own argument when he suggests in his brief that the evidence was prejudicial because it corroborated de Pianelli's testimony. The surveillance evidence showed that these defendants had indeed been present at the various sites during the course of the conspiracy. To say that such evidence is prejudicial because it would permit a jury to find a person guilty is only to demonstrate its probative value. The prejudicial effect, other than insofar as it led to a conviction, was low. There was no error in admitting this evidence.

■ Lipper's final argument is that Rule 801(d)(2)(E) of the Federal Rules of Evidence, which permits the jury to consider the hearsay declarations of co-conspirators, is unconstitutional because it violates the confrontation clause. This argument is frivolous. *See Dutton v. Evans,* 400 U.S. 74, 80–81, 91 S.Ct. 210, 215–16, 27 L.Ed.2d 213 (1970).

Jesse Storey was convicted only on Count I, the conspiracy count. In his brief on appeal he raises two points. First he contends that there was insufficient evidence to support the conviction on the conspiracy count. He supports this contention by pointing to the fact that no one ever identified him in the courtroom. In addition, he contends that the only nonhearsay evidence which linked him to the conspiracy was at best an equivocal identification of him as having been present at St. Marks. Since there was no nonhearsay evidence linking him to the conspiracy, he concludes that it was improper for the jury to consider hearsay evidence. The government responds by arguing that there was sufficient evidence to show that Jesse Storey was part of the conspiracy. The government's position is based upon combining the testimony of de Pianelli with that of Lawrence. According to de Pianelli, one of the Storey brothers, though he was not sure which, arrived at the time the marijuana load arrived at St. Marks. During direct examination de Pianelli stated that he thought that it was Jesse Storey. Later in his testimony de Pianelli said that another Storey brother was present in Santa Barbara and that he was the same brother who had been present at St. George Island. In Lawrence's testimony he said that it was Larry Storey who was present at Santa Barbara. Combining the two, the government contends that there was sufficient evidence to show that Jesse Storey was a participant in the conspiracy.

Since the government is entitled to benefit from all reasonable inferences which may be drawn in favor of the jury's verdict, we agree that the combination of testimony shows that Jesse Storey was at St. Marks Island. Even so, the record only shows that Jesse Storey was present. de Pianelli testified that he was not present on the dock when the boat with the marijuana arrived. He could not have seen whether Jesse Storey was on board the boat. de Pianelli never said that he had seen Jesse Storey participate in the actions of the conspirators. There is no sufficient evidence upon which to base a conviction of conspiracy.

See, e. g., Causey v. United States, 352 F.2d 203, 206–07 (5th Cir. 1965). Jesse Storey's conviction for conspiracy must therefore be reversed and remanded to the district court with directions to dismiss. Burks v. United States, —— U.S. ——, 98 S.Ct. 2141, 57 L.Ed.2d 1 (No. 76–6528 June 14, 1978).

Jesse Storey's second argument was that the trial court erred in responding to a question from the jury. Even if the response was erroneous, no other defendant would have been prejudiced. Since we have reversed Storey's conviction for lack of sufficient evidence, we need not consider this second point.

Roger Schlager was convicted on Count I of conspiracy to import marijuana and on Count III of knowing and intentional importation at St. Marks. His appeal, like his defense at trial, is based upon an alibi which he developed in two parts. First, he contended that his brother Robert, who died in 1975, looked so much like him that even their mother often mistook them. Second, he claimed that he had been in California at the time of the acts named in the substantive counts of the indictment. To support his alibi he called his mother to testify. Her testimony, however, provided only limited confirmation of Schlager's contentions. She did identify the people in photographs which previously had been shown to de Pianelli. Her identification showed that in two of the three photographs de Pianelli had mistaken Robert for Roger. She also said that Roger was in California on Father's Day, June 18, 1972. The testimony of de Pianelli was that the importation at Orange Beach occurred about five days before hurricane Agnes, which struck on June 19. Thus, the jury could have concluded that there was no inconsistency between de Pianelli's testimony and Mrs. Schlager's. She also said that she was "quite sure" that Roger had been with her for "all the Christmases." The events at St. Marks took place in December 1972; no definite date was given. Again, there was no necessary inconsistency between the testimony of the two people. Finally, she said that Roger always came home for her birthday, No-

vember 10. She was not, however, able to say positively that he had been in California on her birthday in 1973, the day that Johnson told de Pianelli that Schlager was at St. George Island.

Schlager contends that the evidence of his participation in the conspiracy was based upon his presence at St. Marks and at St. George Island. Since his alibi proved that he was not present at either place, he concludes that there was insufficient evidence to support his conviction for conspiracy. To buttress that conclusion he points to the possibility that de Pianelli had confused him for his brother, whose name was on the registration of one of the mobile homes sighted at Interarity Point.

■ Schlager's first argument on appeal is that the trial court erroneously charged the jury about the effect of his alibi on the conspiracy charge. Schlager contends that the court directed the jury not to consider the alibi as a defense to the charge of conspiracy. That contention is based upon a misreading of the charge. The trial court charged the jury in these words:

> In this case the defendant, Roger Mark Schlager, has introduced evidence respecting an alibi which amounts to the contention that the defendant was not present at the time when, nor at the place where, he is alleged to have committed the offense charged in the indictment.
>
> If you find from the evidence that he was guilty of the offense charged under Count I [conspiracy] then you will not consider this defense. If, however, you find he is not guilty of the offense charged in Count I then you should consider this defense in your consideration of his guilt or innocence under Count III and Count IV.

The first sentence of the second paragraph which was quoted above clearly indicates that the jury could consider the alibi defense during its deliberations on the conspiracy count. Only after it found Schlager guilty of the conspiracy count was it to disregard the alibi defense. *Cf. Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946); *United States v.*

*Becker,* 569 F.2d 951, 958–59 (5th Cir. 1978). There was no error in the charge to the jury with respect to the conspiracy count.

■ Schlager's second argument is that the trial judge erred in responding to questions from the jury. Schlager argues that the trial judge provided a summary of the evidence which differed from the evidence which was introduced at trial. During its deliberations the jury sent these two questions to the judge:

> Check through the testimony of the marina operators Shields, Finn, Blanchard, and Lynn and find out if any of them visually identified Roger Schlager in the courtroom.
>
> Did John de Pianelli testify that Roger and Dennis were going back and forth in the boat at St. Marks at night?

After discussing the questions with counsel, the judge responded to the first question in this way:

> Now, I have tried to get the full meaning of your question. If this is not what you wanted to know, you can tell me that, but the answer I give you is this and if you want any of the testimony read back to you, I will. None of these people whose names you have mentioned were specifically asked to identify Roger Schlager in the courtroom and none of them did identify him.
>
> THE FOREMAN: O.K. That's what we wanted to know.

Schlager contends that the question required only a yes or a no answer and that the judge's answer implied that if the witnesses had been asked to identify Schlager they would have. Schlager's interpretation is incorrect. The jury's question related to four individuals. To have responded with either "yes" or "no" could have misled the jury and would have been an incomplete answer. The judge accurately stated what had occurred during the testimony of these four witnesses. The response did not add evidence or mislead the jury by providing an improper inference.

The judge also consulted with trial counsel before responding to the second question

in this way: "he testified he was told by both of them that they were going out on the boat." Schlager prefaces his objection to that response with the observation that de Pianelli regularly referred to the defendants by their surnames. Since Roger and Robert were indistinguishable, Schlager contends that de Pianelli's references to "Mr. Schlager" cannot be presumed to have been references to Roger Schlager. Thus, when the jury asked whether de Pianelli testified that "Roger and Dennis" were in the boat at St. Marks, the correct answer, according to Schlager, would have been that de Pianelli said only that "Mr. Schlager" was present at St. Marks. He contends that by its answer, the trial court provided the only link between Roger Schlager and the St. Marks incident.

Such an argument presumes that the entire proceedings at the trial were to be viewed through the lens provided by Schlager's alibi. That the lens distorts the actual proceedings of the trial is evident from the early testimony by de Pianelli. One of the first questions asked by the prosecutor was whether de Pianelli knew "Roger Mark Schlager." de Pianelli responded that he did. Then he was asked if he could identify Roger Schlager, which he did. In fact, Schlager's counsel stipulated that de Pianelli had pointed to the defendant, Roger Mark Schlager. Furthermore, on at least three other occasions de Pianelli referred to "Roger Schlager." According to his testimony, when de Pianelli arrived at the house on St. George Island, those present were "J. Moen, Candy Davis, Roger Schlager, myself and my wife." While he was at the house there was "general conversation" with "J. and Roger and Candy and my wife." After that response, the following dialogue occurred:

Q. [by the prosecutor] You said Roger?
A. [by de Pianelli] I am sorry, Mr. Schlager.
Q. Roger Schlager?
A. Yes sir.

Later in his testimony de Pianelli explained that he had been told that "Mr. Roger Schlager" and "Mr. Dennis Lipper" had been involved in the first transaction at Interarity Point before he arrived. It is clear, then, from reading the entire transcript of de Pianelli's testimony that his references to "Schlager" were references to Roger Mark Schlager. The trial court did not err in responding to the second question as it did.

de Pianelli's failure correctly to identify Robert and Roger in photographs created a question for the jury as to the accuracy of de Pianelli's identification. The trial court, however, properly charged the jury on the issue of identification:

Respecting Defendants Roger Mark Schlager, Jesse Roscoe Storey and Lawrence Jess Storey, Jr., an issue in this case is the identification of the defendant as the perpetrator of the crime. The Government has the burden of proving identity, beyond a reasonable doubt. If you are not convinced beyond a reasonable doubt that the defendant was the person who committed the crime, you must find the defendant not guilty.

You may take into account any occasions in which the witness failed to make an identification of defendant, or made an identification that was inconsistent with his identification at trial.

With such an instruction before it, the jury was directly presented with the question of identification. Since the judge did not err in responding to the jury's questions, Schlager's conviction on both counts must be affirmed.

Larry Storey was convicted only on Count I for conspiracy to import marijuana. On appeal he raises two points. First, he challenges the sufficiency of the evidence to support his conviction for conspiracy; second, he contends that it was an error to admit the testimony of Bill Lawrence concerning the collection of the debt owed to Johnson by de Pianelli. Since Storey's challenge to the sufficiency of the evidence is based upon the admission of the testimony concerning the debt collection, we shall consider that point first. Storey contends that the evidence was irrelevant and inadmissible because the events oc-

curred after the conspiracy had ended. He further contends that because the testimony showed that the defendants were "bad men" its prejudice to the defendants was greater than its slight probative value. The flaw in Storey's argument is that it fails to recognize that Lawrence testified that there was at least one if not two other importations in the planning stage at the time the debt was to be collected. de Pianelli's testimony had established that the conspirators operated by funding successive importations with the profits from previous transactions. Thus, for Johnson to be able to fund future importations, which he was planning, it was necessary that he collect the proceeds due from the immediately past importations. Therefore, the collection of the money which de Pianelli owed him had both past and future connections. In short, the evidence was admissible as demonstrating the continuing nature of the conspiracy or of the criminal enterprise. Larry Storey was an active participant in the attempt to collect the debt from de Pianelli. In addition, earlier, when de Pianelli returned to St. George Island, Larry Storey was there and told him of the difficulties of transporting the marijuana from Colombia. All of this demonstrates that there was sufficient direct evidence to link him to the conspirators. Once he was linked to the conspirators, then statements of his co-conspirators were admissible as well. From those statements, it was established that Larry Storey had been on the boat which brought the marijuana to Orange Beach; that he had been at St. George Island when de Pianelli arrived from the District of Columbia; and that he had related events which occurred in Colombia to delay the arrival of the marijuana. The conspiracy came to an end not with the importation to St. George Island, but, according to Lawrence's testimony, only after the conspirators became aware of the surveillance by law enforcement officials. Larry Storey was an active, knowing participant in the conspiracy until its involuntary end; therefore his conviction must be affirmed.

■ The final defendant, Brent Harelson, was convicted on two counts, conspir-

acy to import marijuana and the substantive act of importing at St. Marks. On appeal he raises three points. First, he contends that it was an error for the trial court not to charge the jury that the government must prove an overt act as part of its burden of proving a violation of 21 U.S.C. § 963. Consideration of that contention is made unnecessary by two recent decisions of this court which have held that under section 963 as well as its parallel, section 846, proof of an overt act is not required. *United States v. Thomas*, 567 F.2d 638, 641 (5th Cir. 1978); *United States v. Palacios*, 556 F.2d 1359, 1364 n.9 (5th Cir. 1977).

■ Harelson's next contention is that there was insufficient evidence to support the conviction on either count. On Count I, the conspiracy count, Harelson contends that de Pianelli's testimony showed that Harelson was no more than a purchaser and indeed a purchaser who had no knowledge of the conspiracy. Support for that contention comes from portions of de Pianelli's testimony in which he said that Harelson was a mere purchaser. As the government points out in its brief, however, the testimony taken as a whole reveals direct proof of a continuing relationship between Harelson, de Pianelli, and Johnson during which Harelson acted to advance the joint interest of all the conspirators. From the start Harelson provided front money to permit the financing of importation of marijuana. He also relayed messages from Johnson to de Pianelli concerning meetings in Florida. Harelson was present during and was a participant in discussions about the importations at Orange Beach and St. Marks. de Pianelli's testimony showed that Harelson was an active, knowing participant in the conspiracy to import marijuana.

■ Harelson contends also that there was insufficient evidence to support his conviction on Count III, which charged a substantive act of importation at St. Marks. Once we have concluded that there was sufficient evidence to prove that he was a knowing member of the conspiracy, no ad-

ditional evidence is necessary to warrant a conviction on a substantive count which charges him with an event which occurred while he was active as a member of the conspiracy. *See, e. g., United States v. Becker, supra,* 569 F.2d at 958–59. Nevertheless, Harelson contends that there was no proof that the St. Marks importation was from outside the customs territory of the United States or that any defendant involved there had traveled outside the United States. To support the guilty verdict he says one must assume that the defendants acted either as part of a larger conspiracy or that one of them arranged this importation. The latter was true according to de Pianelli's testimony. When Storey arrived with the 4,000 pounds of marijuana, he came on a skiff which Lipper and Schlager said had sailed into the Gulf to pick up a load from another vessel. de Pianelli testified that from the markings on the bags and from his testing of the marijuana, it was evident that the marijuana had come from Colombia. "Customs territory of the United States" is defined as including "only the States, the District of Columbia, and Puerto Rico." *See* Headnote 2, Revised Tariff Schedules, 19 U.S.C. § 1202; 21 U.S.C. § 951(a)(2). Although there may be cases in which careful consideration is necessary to determine if a substance was imported from outside the customs territory, this is not such a case. The evidence introduced at the trial showed that the marijuana came from Colombia. None of the evidence would support an inference of any other origin. The nation of Colombia is so clearly outside the customs territory of the United States as not to require instruction.

■ Harelson's final contention is that it was an error for the trial judge to fail to instruct the jury that the defendants were not on trial for conduct not alleged in the indictment. He supports his contention by characterizing the events which occurred in an attempt to collect the debt from de Pianelli as "others crimes" including theft, extortion, kidnapping for ransom or false imprisonment, and assault and battery. That characterization is inappropriate. The purpose of introducing the testimony concerning the debt collection was to show that the conspiracy was continuing and that the conspirators intended to import additional loads of marijuana. The testimony did not relate to "other crimes" but instead related to the substance of the offense charged. The trial court properly instructed the jury that they were to determine the guilt or innocence of each defendant based only upon the evidence against that defendant. Thus there was no error and Harelson's convictions are affirmed.

In summary, we have concluded that the trial court did not commit reversible error in its conduct of the proceedings and that there was sufficient evidence to support the conviction of all defendants except Jesse Storey. His conviction is reversed and remanded to the trial court with directions to dismiss. With the exception of Johnson's conviction for conspiracy to import marijuana all other convictions are affirmed. Johnson's conviction on the conspiracy count is vacated because it was a lesser included offense to the charge of engaging in a continuing criminal enterprise.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART, AND VACATED IN PART.