UNITED STATES of America,
Plaintiff-Appellee,

v.

Bobby Gene ROBINSON,
Defendant-Appellant.

No. 76–1169
Summary Calendar.*

United States Court of Appeals,
Fifth Circuit.

July 21, 1976.

Rehearing and Rehearing En Banc
Denied Sept. 30, 1976.

Andrew H. Marshall, Fed. Publ. Defender, Macon, Ga., for defendant-appellant.

John W. Stokes, U. S. Atty., Dorothy T. Beasley, Asst. U. S. Atty., Atlanta, Ga., for plaintiff-appellee.

Before BROWN, Chief Judge, GEWIN and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

The Defendant in this case was convicted of possession of stolen United States Treasury checks in violation of 18 U.S.C.A.

*Rule 18, 5 Cir.; see *Isbell Enterprises, Inc. v. Citizens Casualty Company of New York et al.,* 5 Cir., 1970, 431 F.2d 409, Part I.

§ 1708. The issue presented by this appeal is whether the trial court erred in denying the Defendant's Motion To Suppress certain articles of mail which were seized by officers during a warrantless search of the Defendant's vehicle. We hold on the basis of Judge Gewin's recent opinion for the Court in *United States v. Rias*, 5 Cir., 1975, 524 F.2d 118 that the "stop" of the Defendant's vehicle was unlawful and the resultant search and arrest of the Defendant and his companion were violative of the Fourth Amendment and accordingly we reverse.

## FACTS

As always in Fourth Amendment search and seizure cases the facts are important. On May 4, 1975, two Atlanta, Georgia police officers were parked at an apartment building in a predominantly Black neighborhood where they had recovered a stolen car and were awaiting the arrival of automobile theft detectives who could go after the suspect. The officers were familiar with the neighborhood and its residents because it was their regular beat.

While they were waiting for the detectives the officers happened to notice a new 1975 Plymouth automobile drive past slowly. It is significant to note that this type of automobile was customarily used by Atlanta detectives and the officers thought the car in question was an unmarked police vehicle. Shortly thereafter, the same vehicle again passed by and the officers left their location to catch up with it, believing it to be the car driven by the automobile theft detectives for whom they were waiting. After pulling out of their location they discovered the vehicle had stopped along the side of the road a short distance away and so the police vehicle pulled up parallel to the Plymouth and at that time, officer Smith, who was on the passenger side of the police vehicle noticed that instead of auto theft detectives, two young black males occupied the vehicle. The defendant, Bobby Gene Robinson, was seated on the driver's side of the vehicle.

Without speaking to the occupants of the car, officer Smith got out of his vehicle and went to the rear of the Plymouth and transmitted the tag number to the police station. Officer Smith then approached the defendant and asked to see his driver's license. According to the testimony of Smith the Defendant reached down toward the floorboard in an attempt to push a paper bag under the seat and it was this motion that drew Smith's attention to the paper bag on the floorboard of the driver's side of the car. Pursuant to Smith's request the Defendant produced a driver's license and testified that while Smith examined it the Defendant appeared to be pushing the paper bag with his heal under the front seat.

Apparently due to this manipulation of the bag by the Defendant, a brown window-type envelope slid out of the paper bag. According to Smith's testimony he recognized this as the same type of envelope which contained Government checks and accordingly asked "what is that"? At this time the passenger in the vehicle swung open the door and started to leave the vehicle but officer Smith and his partner drew their weapons and prevented him from doing so.

Smith seized the bag and then placed the occupants in the police vehicle and then examined the contents of the paper bag and discovered that they were United States Treasury checks and at that time placed them under arrest for possession of stolen checks.

*Arrest Incident To A Search?: The Cart Before The Horse*

██ It is beyond cavil—and the government does not contend—that probable cause to search or arrest existed at the time the defendants were stopped. Indeed, probable cause did not exist until after the officer's search turned up the stolen mail. "It is axiomatic that an incident search may not precede an arrest and serve as part of its justification". *Sibron v. New York*, 1968, 392 U.S. 40, 63, 88 S.Ct. 1889, 1902, 20 L.Ed.2d 917, 934, *citing Henry v. United States*, 1959, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134; *Johnson v. United States*, 1948, 333 U.S. 10, 16–17, 68 S.Ct. 367, 92

L.Ed. 436. Thus, the search cannot be justified as incident to a lawful arrest, even though at the time the arrest was finally made at the end of this sequence of events there was probable cause to believe that a crime had been committed.

 Rather, the inquiry must be whether the initial stop was justified, for if it was not, all that followed was the illegal fruit of the "Wong Sun" tree. *Wong Sun v. United States,* 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441; *Weeks v. United States,* 1914, 232 U.S. 383, 34 S.Ct. 341, 58 L.Ed. 652.

To be sure, the courts have recognized the right of police officers to stop and detain an individual under certain circumstances and with less than probable cause. *See, e. g., United States v. Rias,* 5 Cir., 1975, 524 F.2d 118, 120–21, *citing Adams v. Williams,* 1972, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612; *Terry v. Ohio,* 1968, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889; *United States v. McCann,* 5 Cir., 1972, 465 F.2d 147, *cert. denied sub. nom., Kelly v. United States,* 1973, 412 U.S. 927, 93 S.Ct. 2747, 37 L.Ed.2d 154. However, the circumstances required to justify such action "must be sufficient to enable a police officer reasonably to suspect that the particular individual is involved in criminal activity." *United States v. Rias, supra* at 121, *citing United States v. McCann, supra* at 158; *Terry v. Ohio, supra,* 392 U.S. at 30, 88 S.Ct. at 1884, 20 L.Ed.2d at 911.[1]

 But even under this more lenient standard, the facts of this case indicate that Smith and his partner could not have reasonably suspected that criminal activity was afoot at the time they made the "stop".[2] In the instant case, the facts within the officers' knowledge at the time they made the stop simply were not enough to justify a reasonable conclusion that any criminal activity had occurred or was about to occur.

All the officers knew at the time they made the stop was that the same car had twice passed their location at a slow rate of speed, the car was a new car in a poor neighborhood which was atypical, and since the car was a 1975 Plymouth they mistakenly thought that the car was an unmarked police vehicle. These facts simply do not indicate criminal activity of any type.

It is instructive to juxtapose the facts of *Adams v. Williams, supra,* with the case at bar. There the Supreme Court upheld an investigative stop and subsequent arrest and search where an officer patrolling a high crime neighborhood was informed by an informant known to him that an individual seated in a nearby vehicle was carrying narcotics and had a gun in his belt.

Based upon this information the officer approached the vehicle and asked the occupant to open the door, but instead the occupant rolled down the window. At this time the officer reached into the vehicle and removed the gun from the suspect's belt. The officer then arrested him for unlawful possession of the pistol and the search which was made incident to this arrest uncovered heroin, a machete and another revolver.

Although there was not sufficient probable cause to arrest at the time the initial stop was made, the Court recognized that "[T]he Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. . . . A brief stop of a *suspicious* individual in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time." *Id.*

---

1. In *Adams,* the Court stated: "A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable *in light of the facts known to the officer at the time*". 407 U.S. at 146, 92 S.Ct. at 1923, 32 L.Ed.2d at 617 (emphasis added).

2. Of course, in the Fourth Amendment sense, the term "stop" does not mean a physical stop but rather a restraint of movement. Thus, the fact that the car was already stopped at the time the officers approached is of no moment in the constitutional inquiry.

at 145–46, 92 S.Ct. at 1923 (emphasis supplied).

But unlike *Adams* the officer in this case had absolutely no reasonable suspicion that these individuals were in any way involved in criminal conduct. All that was known at the time of the stop was that these persons were driving a new car which resembled a police vehicle in a poor neighborhood. No effort at evasion had been made by the occupants of the vehicle, and on the contrary, the car was parked on the side of the road.

In stark contrast the patrolman in *Adams* had a tip from a previously reliable informant that the suspect was presently involved in various criminal acts and this, when combined with the suspect's refusal to get out of the car so that the officer could see him, would certainly create a sufficient quantum of suspicion in the mind of a reasonable officer to justify the stop and limited intrusion in *Adams.*

■ And unlike this case, the officer in *Adams* had probable cause to arrest and conduct a search incident to the arrest once he discovered the gun, the possession of which was a crime in itself unless the possessor had a permit to carry it. Here, all that the officer saw was the defendant acting in a furtive way trying to kick a bag under the seat which apparently contained envelopes resembling those used to transmit government checks. The possession of a paper bag apparently containing one or more envelopes is hardly a crime in itself and could not supply probable cause to arrest or conduct a further search. Only after the officer had taken the suspects into custody and opened the bag and the envelopes contained therein, did the officer have probable cause to believe a crime had been committed. This was too late, for at that time the illegal search was finished.

The Fourth Amendment does not have that special feature known as hindsight. We cannot judge the constitutional propriety of police action based upon what later proves to be an expedient means of discovering the crime. The Fourth Amendment establishes boundaries which may not be violated by the government and its animate functionaries. Once this sanctuary of individual liberty has been violated we cannot allow the adventuresome official to return with forbidden fruit.

In *United States v. Rias, supra,* a case with facts much analogous to the one at hand, we came to a similar conclusion that the "stop" was not supported by reasonable suspicion and therefore we ordered that the evidence obtained in the subsequent search should be suppressed. Unable to improve on the Court's exegesis of the facts in that case we quote at length its opinion:

Defendant Rufus A. Rias appeals from his judgment of conviction for possession of stolen mail in violation of 18 U.S.C. § 1708. We reverse.

On September 5, 1974 at approximately one o'clock in the afternoon, Officer Michael Richberg of the Miami Public Safety Department was observing traffic from a marked car when he noticed the defendant and a passenger, both black males, drive past in a black Chevrolet. Richberg knew that two black males in a black or blue Chevrolet were suspects in a series of Farm Store robberies, the most recent of which, so far as he knew, had occurred at least two weeks and possibly a month earlier; he also knew that there was a Farm Store in the general vicinity. The officer attempted to follow the car, but soon lost it and returned to his original location. When, about twenty minutes later, he again sighted the vehicle traveling in the opposite direction, he followed for about seven blocks and then signaled the driver to pull over. The officer testified that it was not unusual for blacks to be seen in this area of the city, that when he followed the men in a marked car they made no attempt to flee, and that he did not stop them for violating any traffic laws.

Richberg first talked with appellant Rias's companion, who stated that his sister had had a flat tire and that the men had gone to help her. Rias, who had been

driving the automobile, was then questioned. He produced a valid driver's license to establish his identity, and told the officer that he had been to see an attorney. When informed of the discrepancy in their stories, Rias explained that he was a postal employee and "didn't want anybody to know where he was going and that his friend was just scared to tell [the officer] the truth."

Following a fruitless pat-down of the men, Richberg secured them in the back of the police car and informed them of their rights, although he did not advise them of any specific charge. He then searched the vehicle and discovered in the closed glove compartment a number of blank, personalized checks, which became the basis of the indictment against Rias. In a non-jury trial, Rias was convicted of possession of stolen mail.

The facts of this case, when compared to those of *Rias,* are even less indicative of criminal activity than those we found insufficient to form a basis for reasonable suspicion to stop in *Rias.* In *Rias* the officer at least knew that a similar vehicle had been used in robberies in the fairly recent past which could at least connect—albeit by a very thin thread—the defendant's conduct with criminal activity. Here, all the policeman knew was that they observed a new car in a poor neighborhood which resembled a police vehicle. Of course, these facts have no relation whatsoever to criminal activity.

We cannot fault the officers in this case for following a vehicle which they thought to be occupied by detectives, but when they

pulled parallel to that stopped vehicle and found that they were mistaken they had no reason to proceed with an investigation of the type pursued here. Only because of this illegal "stop" did the sequence of events lead to the Defendant's arrest and ultimate conviction.

### Vehicle Search Cases Inapposite

Putting aside the issue of the illegal "stop", "the law is clear that a moving vehicle is subject to a warrantless search if probable cause and exigent circumstances exist." *United States v. Freund,* 5 Cir., 1976, 525 F.2d 873, 875, *citing Chambers v. Maroney,* 1970, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419; *Carroll v. United States,* 1927, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543.[3] We find unpersuasive the government's argument that the defendant's nervousness and attempt to conceal the paper bag and the passenger's attempt to leave the vehicle provided an ample basis for probable cause. Had such suspicious conduct occurred before the stop it would have provided a basis for an investigatory stop in the *Terry* mold, but that alone is not sufficient to form a basis for probable cause. After all, until after the search had been completed, the bag opened and the mail examined the officer did not know what, if any, crime had been committed.

### Plain View

Even assuming the officer had a reasonable justification for being where he was at the time he saw the bag[4]—and this is a

---

**3.** The government in its brief, see government's brief at pp. 11–12, relying on *Preston v. United States,* 1964, 376 U.S. 364, 366–67, 84 S.Ct. 881, 882, 11 L.Ed.2d 777, 780, argued that a lesser standard of probable cause should be applied to warrantless vehicle searches than the warrantless search of buildings. "But even in the case of motor cars, the test still is, was the search unreasonable," *Preston v. United States* at 367, 84 S.Ct. at 883, and in the case at hand we find that the search was unreasonable. A general suspicion of criminal activity as might have reasonably been created in the minds of the officers when the passenger attempted to get out of the car and the driver

nervously attempted to push the paper bag under the seat, is simply not enough to satisfy the *reasonableness* requirements of the Fourth Amendment.

**4.** The plain view exception to the Fourth Amendment requirement of probable cause is conditioned upon the requirement that the police officer have a "prior justification for an intrusion in the course of which he came inadvertently across a piece of evidence incriminating the accused." *See Coolidge v. New Hampshire,* 1971, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564, 583.

broad assumption in view of our previous discussion of the officer's justification for the stop—"the extension of the original justification is legitimate only where it is immediately apparent to the police that they have evidence before them; the 'plain view' doctrine may not be used to extend a general exploratory search from one object to another until something incriminating at last emerges." *See Coolidge v. New Hampshire*, 1971, 403 U.S. 443, 466, 91 S.Ct. 2022, 2038, 29 L.Ed.2d 564, 583. Without peradventure, a paper bag is not an item which would immediately appear to be evidence of criminal activity, nor can it reasonably be said that a brown window-type envelope which might include a government check is particularly indicative of criminal activity.

We conclude by reiterating the sound policy aptly expressed in *Rias:*

Were we to fail, on these facts, to condemn the actions of the officer in stopping and arresting Rias, there would remain virtually no limitations on the power of the police to stop, arrest, and search citizens and their vehicles and then use any incriminating evidence they may find in a court of law. Such unbridled license would effectively eliminate from the Constitution the Fourth Amendment protection afforded citizens in public places. That is a result which we cannot condone.

Reversed.

REVERSED.