UNITED STATES of America,
Plaintiff-Appellee,

v.

Lewis Davis MICHEL, Robert Joseph Belmares, John Handy Jones, Daniel Stewart Henshaw and Ted Ray Hines, Defendants-Appellants.

No. 77–5518.

United States Court of Appeals,
Fifth Circuit.

Feb. 1, 1979.

Rehearings Denied March 2, 1979.

**990**

Melvyn Carson Bruder, Dallas, Tex., for Michel and Jones.

Gary D. Jackson, Dallas, Tex., for Henshaw and Belmares.

Ted Ray Hines, pro se.

John Handy Jones, pro se.

Michael H. Rodgers, Dallas, Tex., for Hines.

Kenneth J. Mighell, U. S. Atty., Fort Worth, Tex., Judith A. Shepherd, H. Jay Ethington, Asst. U. S. Attys., Dallas, Tex., for plaintiff-appellee.

Before GEWIN, RONEY and GEE, Circuit Judges.

GEE, Circuit Judge:

### Facts

This case arose out of a two-year scheme to import large quantities of marijuana into the United States from the Republic of Mexico. The scheme, more notable for its spectacular failures than for its successes, was at last brought to a halt by various law enforcement agencies following the importation of two plane loads of marijuana into South Texas from Mexico. Count 1 of the 17-count indictment charged a conspiracy among 19 named defendants and others to acquire marijuana in the Republic of Mexico and to transport it to Dallas, Texas, and other areas of the United States in violation of 21 U.S.C. § 963.[1] In count 2, appellant Belmares was charged with the conduct of a continuing criminal enterprise in violation of 21 U.S.C. § 848.[2] Counts 4 and 5 charged Belmares and others with importation of marijuana in violation of 21 U.S.C. §§ 952(a)[3] and 960.[4] Counts 10, 11 and 12

---

[1]. 21 U.S.C. § 963 provides:

Any person who attempts or conspires to commit any offense defined in this subchapter is punishable by imprisonment or fine or both which may not exceed the maximum punishment prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

[2]. 21 U.S.C. § 848 provides in part:

(a)(1) Any person who engages in a continuing criminal enterprise shall be sentenced to a term of imprisonment which may not be less than 10 years and which may be up to life imprisonment, to a fine of not more than $100,000, and to the forfeiture prescribed in paragraph (2) . . . .

\* \* \* \* \* \*

(b) For purposes of subsection (a) of this section, a person is engaged in a continuing criminal enterprise if—

(1) he violates any provision of this subchapter or subchapter II of this chapter the punishment for which is a felony, and

(2) such violation is a part of a continuing series of violations of this subchapter or subchapter II of this chapter—

(A) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and

(B) from which such person obtains substantial income or resources.

[3]. 21 U.S.C. § 952(a) provides in part:

It shall be unlawful . . . to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter . . . . .

[4]. 21 U.S.C. § 960 provides in part:

(a) Any person who—

(1) contrary to section 952 . . . of this title, knowingly or intentionally imports or ex-

charged appellants Michel, Belmares and others with importation offenses. Count 13 charged an importation offense against Belmares and Jones. In count 14, Jones and another defendant were charged with an additional act of importation.

Appellant Michel was acquitted on counts 11 and 12 and was convicted on counts 1 (conspiracy) and 10 (importation). Belmares was acquitted on counts 11 and 12 and convicted on counts 1 (conspiracy), 2 (continuing criminal enterprise), 4, 5, 10 and 13 (importation). Appellant Jones was acquitted on counts 11 and 12 and convicted on count 1 (conspiracy) and counts 10, 13 and 14 (importation). Appellants Henshaw and Hines were convicted on count 1 (conspiracy).[5]

The evidence adduced by the government at trial established the existence of a loosely organized group of people who, during a period of approximately two years, participated in the importation of marijuana from the Republic of Mexico into the United States. Most of the testimony came from witnesses who were actual participants in the purchase, importation, and transportation of the marijuana and who were testifying pursuant to plea bargains or in exchange for immunity from prosecution. In order to provide an evidentiary foundation for our discussion of the claimed errors and to better identify the "cast of thousands," [6] we shall set out the facts in some detail.

The central figure of the group was appellant Robert Belmares. In early 1975 Belmares, who had been engaged in smuggling marijuana from Mexico by backpack, sought to expand and modernize his operation and to increase his profits by flying the marijuana from Mexico into Texas. Belmares and his associate, Ronnie Dyer, joined forces with Robert Potter, who had a connection for the purchase of marijuana, and T. Michael Powell, who was a pilot for their combined venture. Also joining the group during this period was Allan Wilkes, who helped locate a landing site in Texas. In February of 1975, Powell, Belmares, and Potter flew to Mexico in a private airplane to familiarize themselves with the problems to be encountered in flying across the border. Potter characterized this trip as a "recognizance" mission.

In March of 1975, Potter began purchasing marijuana in Oaxaca, Mexico, using money furnished by himself and Belmares.

ports a controlled substance . . . shall be punished as provided in subsection (b) of this section.

(b)(1) In the case of a violation under subsection (a) of this section with respect to a narcotic drug in schedule I or II, the person committing such violation shall be imprisoned not more than fifteen years, or fined not more than $25,000, or both. If a sentence under this paragraph provides for imprisonment, the sentence shall include a special parole term of not less than three years in addition to such term of imprisonment.

(2) In the case of a violation under subsection (a) of this section with respect to a controlled substance other than a narcotic drug in schedule I or II, the person committing such violation shall be imprisoned not more than five years, or be fined nor more than $15,000, or both. If a sentence under this paragraph provides for imprisonment, the sentence shall, in addition to such term of imprisonment, include (A) a special parole term of not less than two years if such controlled substance is in schedule I, II, III, or (B) a special parole term of not less than one year if such controlled substance is in schedule IV.

5. Appellant Michel was sentenced to concurrent terms of five years imprisonment to be followed by a three-year special parole term. Belmares was sentenced to consecutive five-year terms of imprisonment on counts 1, 4 and 10, to be served concurrently with consecutive five-year terms on counts 5 and 13 and with a fifteen-year term on count 2. In addition, Belmares was assessed a three-year special parole term. Appellant Jones was sentenced to concurrent five-year terms of imprisonment on counts 10 and 13, and they were made consecutive to the concurrent five-year terms imposed on counts 1 and 14. He was also sentenced to serve three years of special parole. Henshaw received a sentence of five years imprisonment and a three-year special parole term, and Hines was sentenced to two years imprisonment and three years of special parole.

6. The cast includes, among others, an electrical engineer, a graduate of the Yale Law School, a real estate salesman, a real estate developer, a combat decorated ex-Air Force captain, and a minister.

The Mexican "connections," or sources of the marijuana, were Oscar Garcia de Anda and Geronimo Rodriguez. Potter handled the Mexican end of the venture, and Belmares was responsible for the return flight to the United States and for transportation of the load and distribution in the United States. Powell flew the load of marijuana from Oaxaca, but the venture ended in disaster when he landed the plane on a beach in Tampico and damaged the landing gear, stranding the cargo. Belmares engaged Thomas Waldon to replace Powell as pilot and to pick up the beached marijuana, which was returned safely to the United States in April with the help of Belmares and a number of his associates.[7] Belmares and Potter then returned to Mexico with funds to begin a month-long series of marijuana purchases. This marijuana was flown by Waldon in May to Addison, Texas, where Wilkes had arranged for the flight to be met.[8]

Between late spring and summer 1975, the same group made additional flights with marijuana. During this time they paid a Mexican official named Luis Garza to provide protection at a landing site in northern Mexico. Belmares became less active in the physical acts of importation but continued to retain a financial interest in the ventures. Belmares and Wilkes had a disagreement concerning some marijuana that vanished in transit;[9] Potter dropped out, but the group continued to use the source introduced to them by Potter at the inception of the plan. Powell continued to fly for the enterprise, and Wilkes was a distribution agent in the United States.

By January 1976, additional people had become involved in Belmares' operation. Appellant John Handy Jones was a pilot for the group and referred to Belmares and Dyer as his partners. Appellant Lewis Davis Michel served as a go-between for Jones and Belmares and performed various serv-ices on the ground, including meeting the flights when they landed in the United States. William C. White had been recruited as a pilot, and on one evening in early 1976 he received a call from Michel asking him to meet Jones at Love Field in Dallas. Michel explained that he had planned to meet Jones at their clandestine airstrip near Cleburne but that Jones passed over the landing site in the darkness and was proceeding to Love Field. White went to the airport as requested and met Jones, who announced that he had just flown in a load of marijuana from Mexico. White later watched as Jones and Michel loaded the marijuana into a van, and Michel drove it away.[10]

Powell continued to fly for the Belmares organization, but in April 1976, a load which Powell had been scheduled to transport from Mexico several weeks earlier was flown by Waldon instead. The marijuana had been purchased with the aid of Oscar Garcia de Anda and Geronimo Rodriguez, the group's Mexican sources. Waldon was forced by weather conditions to land at Temple, Texas, where he was met by Wilkes and another man. The marijuana was unloaded but was transported only as far as the gate of the airport, where all three men were arrested. In May of 1976, Powell was arrested in Mexico, and Belmares, in his attempt to recruit another pilot, was introduced to Douglas Spitler. At this time Spitler was an employee of Jim Wood and was engaged in a separate operation flying marijuana from Mexico into West Texas and New Mexico for Wood and his partner, McVey, using aircraft supplied by James Malone. Neither Belmares nor White was successful in recruiting Spitler to fly for their organization, but White recruited Robert Cross to accompany Jones to Mexico, where a marijuana purchase was made and loaded on their airplane. Cross flew the load to Lancaster, Texas, and

---

7. This act of importation was the basis for count 4 of the indictment.

8. This act of importation was the basis for count 5 of the indictment.

9. The confederates were told that a dog had run off with a duffel bag of the marijuana. No one was totally convinced by this explanation of why the load was forty pounds light.

10. This act of importation was the basis for count 10 of the indictment.

transferred it to a U-Haul truck, but this load was seized after delivery.[11]

In the meantime, Belmares succeeded in obtaining an introduction to Jim Wood. Each had something the other needed. Belmares had excellent connections for high-grade marijuana through Oscar Garcia de Anda and Oaxaca but needed money, planes and a pilot. Wood and McVey had all of these but lacked a source of high-grade marijuana. In late spring of 1976, Belmares and Wood agreed to join forces to their mutual benefit. McVey left the expanded operation at this point because he wished to avoid southern Mexico.

Meanwhile, John Handy Jones, in order to secure a protected landing site in the United States, had offered a bribe to the chief of police of Addison, Texas. In return for the money, Jones expected noninterference with landings at the Addison airport and tipoffs in the event of an impending drug bust. The Addison airport was used in May and June, 1976, for several trips in which Jones, Michel, and Wilkes were involved. In fact, however, the Addison police chief had only pretended to accept the offer and was cooperating with other law enforcement agents. In late June 1976, Michel, Jones, and others were arrested at the Addison airport following a flight from Mexico.[12] In July of 1976, Belmares, Mike Lallier and Wilkes arranged for a landing site and ground crew at Horseshoe Bay in Central Texas, and Belmares then went to Mexico to buy marijuana. One load of marijuana was successfully flown to Horseshoe Bay from Tampico, with Wood assisting at the landing site, but later in the month two of Belmares' ground personnel were arrested at Horseshoe Bay with 200 pounds of marijuana. In September of 1976, Lallier flew a load of marijuana from Oaxaca to a landing strip in South Texas for refueling and on to Dallas, where Wood again helped transport the marijuana when the plane landed.

In October 1976, Spitler, under the direction of Wood and Malone, flew 1,300 pounds of marijuana from Oaxaca to the vicinity of Cotulla and Freer in South Texas. Oscar Garcia de Anda and appellant Henshaw met Spliter at the Oaxaca airport; later Henshaw got on Spliter's plane and directed him to a landing strip in Mexico where, after Henshaw deplaned, the marijuana was loaded on board. Wood met the loaded flight at its return destination in South Texas. At about this time the group recruited Dueal Ray Hulsey, who had become acquainted with Jones while he was in jail following his arrest at Addison in June. The two had discussed marijuana smuggling in their cell, and Hulsey had represented himself to be a pilot. Belmares, in October 1976, asked Hulsey to go to Mexico and to a location in Texas to look at a damaged plane to determine whether it could be safely flown. Upon arriving in Mexico, Hulsey was greeted by Henshaw and Oscar Garcia de Anda, but Hulsey refused to fly the damaged plane back to the United States. Although Hulsey was recruited as a pilot and represented himself to be one, he was not a licensed pilot and was in fact cooperating with law enforcement agencies during this period. In November 1976, Hulsey was sent by Jones to check a prospective landing site in the Cotulla-Freer vicinity. Belmares told Hulsey that he (Belmares) was in charge of the details and scheduling of the trips.

During this November 1976 time frame, two meetings were held at which a future importation trip was discussed. Spitler attended both meetings; at the first he met with Wood and Malone and was introduced to appellant Hines. Wood explained to Spitler that Hines owned a motor home and was considering driving marijuana for the group. At the second meeting, Spitler met with Wood, Belmares, Jones, Henshaw and others. Also in November 1976, Belmares and Lallier had purchased an airplane registered in the name "G. Oscar Andan," whose address was listed as 3710–A Cedar Springs in Dallas. The plane, an Aero Commander with the identification number N344V, was

11. This act of importation was the subject of count 13 of the indictment.

12. The flight on this occasion was the basis for count 14 of the indictment.

used in November and early December for various smuggling trips.

As a result of Spitler's November meetings, a trip was planned for December 9, 1976. Spitler and Jones flew to Oaxaca in separate planes. Spitler's aircraft had been obtained by Wood and Malone; Jones flew N344V. In Mexico, both planes were loaded with marijuana and prepared for the return trip to the Cotulla-Freer area. On the morning of December 9, Henshaw was observed in Dallas moving airplane seats from one automobile to another and was joined shortly thereafter by Belmares and Oscar Garcia de Anda. Later that morning Henshaw drove to 3710 Cedar Springs and was observed attaching a radio antenna to a bobtail truck. That evening, on Farm Road 624 in the Cotulla-Freer vicinity, the truck was observed meeting a motor home and an automobile. Two of the vehicles were placed some distance apart facing one another on the road. As the aircraft flew overhead without lights, the headlights of the two vehicles were turned on for a short period of time, illuminating the makeshift landing strip.

The pilots of the aircraft overhead were Spitler and Jones, who had kept each other in sight and had maintained radio contact on the flight from Mexico. Spitler landed on the farm road first, and Wood and others unloaded the aircraft. Spitler and Wood then flew to San Antonio, where they were arrested by Customs pilots and the plane was seized. Near the landing site, Bennet was arrested in his automobile and Hines was arrested in the motor home, which was loaded with marijuana. Two other men fled, abandoning the marijuana-loaded bobtail truck. Jones' plane, N344V, crashed in Beeville, Texas, but Jones salvaged 200 pounds of marijuana. This contraband was driven to Austin around December 11, 1976. Following the ill-fated December 1976 trip, the group was effectively broken up, and arrests, trials and convictions followed.

### Conspiracy to Import Marijuana

All appellants except Jones attack the sufficiency of the evidence to sustain their convictions on count 1, the conspiracy count. Appellants Belmares and Henshaw attack the proof of a single conspiracy and argue that all that was shown was a series of unrelated flights. Appellants Michel, Henshaw, and Hines contend that the evidence is not sufficient to link them to a conspiracy to import marijuana.

In reviewing the sufficiency of the evidence to sustain appellants' convictions, we must view the evidence in the light most favorable to the government, *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), and reverse only if reasonable jurors could not find the evidence inconsistent with every hypothesis of the accuseds' innocence. *United States v. Ragano*, 520 F.2d 1191, 1203 n. 16 (5th Cir. 1975), *cert. denied*, 427 U.S. 905, 96 S.Ct. 3192, 49 L.Ed.2d 1199 (1976). The government must prove, either by direct or circumstantial evidence, an agreement or common purpose to violate the law. *United States v. Warner*, 441 F.2d 821, 830 (5th Cir.), *cert. denied*, 404 U.S. 829, 92 S.Ct. 65, 30 L.Ed.2d 58 (1971). The proof, whether direct or circumstantial, must establish beyond a reasonable doubt that a conspiracy existed between knowing partners. *United States v. Duckett*, 550 F.2d 1027, 1030 (5th Cir. 1977). For a conspiracy under 21 U.S.C. § 963, there is no need to allege or to prove overt acts. *United ed States v. Thomas*, 567 F.2d 638, 641 (5th Cir. 1978). That the single conspiracy charged in the case at bar existed is clear. The government presented overwhelming proof of the illegal agreement or common purpose: Belmares and other agreed to fly marijuana from Mexico into Texas; protected landing strips in both countries were located and secured; pilots and ground crews were recruited; a source for high-grade Mexican marijuana was recruited and engaged; marijuana was purchased in Mexico and flown into Texas to be picked up and distributed by members of the group. The division of labor under Belmares' direction and the continuing nature of the operation are further indicia of the underlying agreement. *United States v. Becker*, 569 F.2d 951, 959 (5th Cir.), *cert. denied*,

—— U.S. ——, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978). Whether a scheme is one conspiracy or several is primarily a question for the jury, *United States v. Rodriguez*, 509 F.2d 1342, 1348 (5th Cir. 1975), and we believe their conclusion here is supported by substantial evidence. That each flight was a random, separate venture discrete from the others defies belief. The group's efforts to maintain protected landing sites and the continuous planning and cooperation between the persons involved convince us that this was one scheme to import marijuana which envisioned as many flights as could safely be made. The plan necessarily required the assistance of many persons performing varied functions; yet there was still only one overall agreement between the parties to perform functions necessary to and in furtherance of the illegal common purpose. This makes out one conspiracy. *United States v. Becker, supra; United States v. Perez*, 489 F.2d 51, 62 (5th Cir. 1973), *cert. denied*, 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). The plan does not become several plans simply because some members were cast in more vital roles than others or because certain members performed only a single function. *United States v. Becker, supra.* Neither does it become several plans because of internal personnel changes. *United States v. Scott*, 555 F.2d 522 (5th Cir.) *cert. denied*, 434 U.S. 985, 98 S.Ct. 610, 54 L.Ed.2d 478 (1977). The government's substantial proof of overlapping membership and activities directed toward a common goal is sufficient to support the jury verdict reflecting a single conspiracy. *United States v. Scott, supra; United States v. Perez, supra; United States v. Morado*, 454 F.2d 167 (5th Cir.), *cert. denied*, 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972).

■ To establish that each individual defendant was a culpable member of the conspiracy, the government must prove that the defendant knew of the agreement and, with that knowledge, voluntarily participated in it. *United States v. White*, 569 F.2d 263, 267 (5th Cir. 1978); *United States v. Caro*, 569 F.2d 411, 416 (5th Cir. 1978). The evidence must be sufficient to show that each defendant had a general knowledge of the overall purpose and scope of the conspiracy, but it is not necessary that the conspirators know each other or the details of each enterprise making up the conspiracy. *United States v. Becker, supra.* Once we have determined that the conspiracy existed and that each defendant committed acts that furthered its unlawful purpose, we must satisfy ourselves that each defendant possessed the requisite knowledge of the general purpose of the agreement. *United States v. Brasseaux*, 509 F.2d 157, 160 & n.3 (5th Cir. 1975). It is in our review of the sufficiency of the evidence of the element of *knowing* participation that this circuit's "slight evidence" rule is used.

> Once it has been established that a conspiracy exists and that a particular defendant was clearly connected to the conspiring group or acted in a manner which unmistakably forwarded the conspiracy, then only slight additional evidence suffices to permit an appellate court to find that the jury could reasonably infer that one shown beyond a reasonable doubt to be a participant was in fact a knowing participant.

*United States v. Becker*, 569 F.2d at 961. *See also United States v. Duckett, supra; United States v. Alvarez*, 548 F.2d 542, 544 (5th Cir. 1977).

■ Government witnesses, who were themselves participants in the venture, clearly established the existence of an ongoing conspiracy to import marijuana, which employed many persons. Belmares' role in the venture cannot be contested. He was the plan's central figure from its inception until the final flight into South Texas some two years later. Government evidence also showed that Michel provided expense money for one flight into Mexico and arranged for a second flight to be met at the Addison, Texas, airport. A government witness testified that Henshaw boarded a plane in Mexico flown by one of the group's pilots and directed him to a landing field so that a load of marijuana could be picked up and flown back to South Texas. Hines was arrested in a motor home full of marijuana

a short distance from the clandestine landing site of the group's final trip. Jones was a pilot for Belmares' operation and flew several of the marijuana flights himself. All appellants clearly committed acts to further the importation scheme.

Far more than the slight additional evidence necessary was adduced. Belmares' knowledge and intent is beyond argument; indeed, he does not directly challenge this aspect of the jury verdict. Government evidence showed that Michel arranged for an airplane in late 1975 and accompanied the pilot to deliver it to Jones in South Texas so that Jones could pick up a load of marijuana stashed in Mexico. In 1976 Michel telephoned the supposedly-bribed Addison, Texas, police chief to deliver a pre-arranged coded message regarding an incoming flight of marijuana. Henshaw was placed, by a government witness, at a November meeting in Dallas between Belmares, Jones (pilot), Spitler (pilot), and Wood (ground operations) at which the December 1976 importation trip was planned. Earlier Henshaw and Oscar Garcia de Anda, the group's "Mexican connection," met Hulsey at the Oaxaca, Mexico, airport and took him to a downed plane for the purpose of determining whether the plane could be repaired so that a load of marijuana could be flown into the United States.

Hines argues most strenuously that no evidence supports the jury's conclusion that he had knowledge of the group's importation purpose. We disagree. In November 1976, Hines was introduced to government witness Spitler (pilot) by Malone (aircraft procurer) as one who had a motor home and was "thinking about doing some driving for us." Spitler was told by Wood (ground operations) that the motor home would be used to transport marijuana. "Aspects of the marijuana" were discussed in Hines' presence during a 20-minute car ride to Wood's apartment in Oklahoma City. This meeting was held about two weeks before the December 9, 1976, trip of the group—an importation trip in which Wood and Spitler were involved. On the evening of December 9 the motor home and two other vehicles were rendezvoused in the Cotulla-Freer

vicinity and proceeded to FM 624 where two of the vehicles illuminated a makeshift runway by facing each other and briefly turning on their headlights. Later, after a landing had been made at this clandestine border site and the plane had again become airborne, the automobiles were followed from the scene, and Hines was arrested a short distance away in a motor home crammed with marijuana. Spitler flew one of the planes from Mexico to this landing site, and Wood assisted in loading the marijuana from the plane into the ground vehicles. The evidence against appellant Hines, as well as that against appellants Belmares, Michel, and Henshaw, is sufficient to support their convictions for conspiracy to import marijuana. Jones did not challenge the evidence to support his count 1 conviction.

### Importation of Marijuana

Appellants Belmares, Jones and Michel assert that their convictions on count 10 (importation) must be reversed for want of sufficient evidence. Belmares and Jones also attack their convictions on count 13 (importation); the former complains that no evidence was introduced to link him to this trip, and the latter contends that his conviction on this count was obtained by the use of marijuana illegally seized following a detention and search of a U-Haul truck without probable cause.

The government proved count 10 through the testimony of William C. White, an immunized witness who for a time participated in the scheme. He testified that Michel called him from Cleburne, Texas, one evening in late December 1975 or early 1976 and asked him to go to Love Field in Dallas to meet Jones, who was flying a load of marijuana in from Mexico. Michel was waiting for him at a secret landing strip, but darkness had forced Jones to overfly the runway and to proceed to Love Field. White did as he was asked and later watched as Jones and Michel transferred the marijuana from the airplane into a van. Michel drove away with the marijuana.

This flight was the basis for count 10 on which Jones, Michel and Belmares were convicted.

Jones and Michel do not contend that this testimony is insufficient to sustain their convictions. They argue that White's testimony must be disregarded because the jury rejected his testimony concerning two other acts of importation alleged in counts 11 and 12 by returning not guilty verdicts on those two counts. We disagree. The jury did not have to credit White's entire story in order to believe a part of it. *United States v. Edwards,* 488 F.2d 1154, 1158 (5th Cir. 1974). It was within their province to accept as true that the act of importation charged in count 10 occurred as White testified and to reject his story as it related to counts 11 and 12. Where a multi-count verdict appears inconsistent, the appellate inquiry is limited to a determination whether the evidence is legally sufficient to support the counts on which a conviction is returned. What the jury did with the remaining counts is immaterial. *United States v. Fuiman,* 546 F.2d 1155, 1157–58 (5th Cir.), *cert. denied,* 434 U.S. 856, 98 S.Ct. 176, 54 L.Ed.2d 127 (1977). The jury's verdict on count 10 against Jones and Michel is based on ample evidence, and their convictions are affirmed.

Jones further argues that his conviction for importation of marijuana on count 13 must be reversed for failure to suppress marijuana seized by Dallas County sheriff's deputies in May of 1976. After Deputy Sheriff Oxford, investigating a call from the Lancaster, Texas, airport, went to the airport to get further information, a radio call was dispatched to stop a U-Haul bobtail truck observed traveling east away from the airport. The truck was stopped a few minutes later, and Rush was arrested for driving without a license. Deputy Oxford arrived at the scene moments after the stop and, while passing within two feet of the padlocked rear of the truck, detected the odor of marijuana. The truck was driven to the sheriff's office where a search of the truck, after a warrant was obtained, revealed 62 bundles containing approximately 1,000 pounds of marijuana. By motion to suppress, Rush unsuccessfully challenged the stop and search. Jones adopted this motion by filing a general "Motion to Adopt Motions of Co-Defendants" but did not file such a written motion of his own. Jones' attorney did not participate in the suppression hearing except to adopt an objection, made by yet another co-defendant, to the admission of any testimony concerning the arrest of Rush and seizure of the marijuana. Jones now complains that the initial stop of the U-Haul was without probable cause and that the seized evidence was inadmissible as "fruit of the poisonous tree." He further contends that the subsequent search of the truck was also without probable cause. The government argues on appeal that Jones has no "standing" to challenge this search and seizure because he has not asserted that *his own* fourth amendment rights were violated. *See Rakas v. Illinois,* —— U.S. ——, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978). Although we might agree with the government were this issue properly presented, we note that Jones' standing to raise a fourth amendment claim was not challenged below and the matter was never litigated. We find it unnecessary, however, to remand for a factual determination of Jones' interest in the place searched or property seized. We hold that the initial stop of the U-Haul truck was legal and that the subsequent search was made upon probable cause.

We must begin by examining the justification for the stop because, if it was illegal, the subsequent acts were fruits of the poisonous tree. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). We recognize the general rule that a police officer may stop a vehicle and request production of a driver's license on "somewhat less" than probable cause. *Dell v. Louisiana,* 468 F.2d 324, 326 (5th Cir. 1972), *cert. denied,* 411 U.S. 938, 93 S.Ct. 1904, 36 L.Ed.2d 400 (1973); *United States v. Marlow,* 423 F.2d 1064 (5th Cir. 1970); *see* Tex.Rev.Civ.Stat.Ann. art. 6687b, § 13 (1977). Police officers may also stop an individual if the officer has reasonable

grounds to suspect that the particular individual is involved in criminal activity. *United States v. McDaniel,* 550 F.2d 214, 217 (5th Cir. 1977); *United States v. McCann,* 465 F.2d 147, 158 (5th Cir. 1972), *cert. denied sub nom. Kelly v. United States,* 412 U.S. 927, 93 S.Ct. 2747, 37 L.Ed.2d 154 (1973). In determining whether reasonable suspicion existed, we must examine the facts known to the officer at the time of the stop. *United States v. Rias,* 524 F.2d 118, 121 (5th Cir. 1975). We can, of course, consider the cumulative knowledge of the officers working on the case, rather than only the knowledge possessed by the officer who made the stop, where there has been some degree of communication between them. *Moreno-Vallejo v. United States,* 414 F.2d 901, 904 (5th Cir. 1969), *cert. denied,* 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 76 (1970).

■ The airport manager called Deputy Oxford at his home sometime after midnight and asked him to come to the airport because something was being transferred from an airplane to a truck at the far end of the runway. The two men had been working together for some months to determine whether the small airport was being used after closing hours as a landing strip for smuggling operations. Their investigation began when the manager found what laboratory tests identified as marijuana in a plane based at the airport. The manager had alerted Deputy Oxford to the possibility of smuggling and began watching the movements of certain private aircraft. After receiving the phone call, the deputy went to the airport and, on the basis of the information he received from the manager, initiated a radio broadcast to stop the U-Haul truck. At the time of the stop, the Dallas County Sheriff's Office had knowledge of the following facts: the Lancaster airport closed at 10:00 p.m. and was seldom used after that hour; the U-Haul truck had been parked beyond the runway with its lights on when the plane began circling the field to land; the truck proceeded through the parking lot with its lights on but drove down the taxiway past the terminal with its lights off; the truck and the plane met at the far end of the runway to begin the transfer of cargo; approximately three people loaded packages into the truck for several minutes; the area where the transfer occurred is not the normal place at this airport, even in daylight hours, for unloading cargo or luggage; similar occurrences at this hour were not common at this airport; the plane took off immediately after the loading ceased; the truck left the airport by driving across open fields away from the terminal rather than by using a paved road that would have taken him past the terminal; the truck was traveling away from the airport in an easterly direction, which was the only direct route to Interstate 635. In addition, Deputy Oxford knew from past experience that small country airports were often used by marijuana smugglers to fly loads in after the airfields closed and that the Lancaster airfield likely had been used for that purpose in the recent past. These facts, viewed as a whole, amounted to suspicion sufficient to warrant an investigative stop. *See United States v. Worthington,* 544 F.2d 1275 (5th Cir.), *cert. denied,* 434 U.S. 817, 98 S.Ct. 55, 54 L.Ed.2d 72 (1977); *United States v. Maslanka,* 501 F.2d 208 (5th Cir. 1974), *cert. denied, sub nom. Knight v. United States,* 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975); *United States v. Rollerson,* 491 F.2d 1209 (5th Cir. 1974); *United States v. McCann, supra. Compare United States v. Robinson,* 535 F.2d 881 (5th Cir. 1976).

■ Having determined the initial stop to be legal, we turn to the remaining sequence of events. When stopped and asked to produce his driver's license, Rush admitted he did not have it with him. Therefore, his arrest was based on probable cause. *Dell v. Louisiana,* 468 F.2d at 326. Moreover, when Deputy Oxford arrived at the scene shortly thereafter to begin his investigation of the airport incident and smelled the marijuana, probable cause clearly existed for a warrantless search of the truck. *Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *United States v. Mitchell,* 538 F.2d 1230 (5th Cir. 1976) (en banc), *cert. denied,* 430

U.S. 945, 97 S.Ct. 1578, 51 L.Ed.2d 792 (1977); *United States v. Walker,* 522 F.2d 194 (5th Cir. 1975). The officers, however, obtained a warrant, and we fail to see how the legality of the search can be seriously questioned. No error was committed in overruling the motion to suppress, and Jones' conviction on count 13 is affirmed.

■■■■ Appellant Belmares' convictions on counts 10 and 13 must also be affirmed. He argues that no evidence connected him directly with these flights, and thus the convictions must be reversed. Again we must disagree. We have held that sufficient evidence existed for the jury reasonably to conclude that Belmares was a knowing participant in a continuing conspiracy to import marijuana from Mexico. Jones did not appeal his conviction for belonging to the same conspiracy, and his convictions for counts 10 and 13, two substantive importation offenses, today have been affirmed. Well settled is the principle that a party to a continuing conspiracy may be responsible for a substantive offense committed by a co-conspirator in furtherance of the conspiracy, even though that party does not participate in the substantive offense or have any knowledge of it. *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946). Once the conspiracy and a particular defendant's knowing participation in it has been established beyond a reasonable doubt, the defendant is deemed guilty of substantive acts committed in furtherance of the conspiracy by any of his criminal partners. *United States v. Sullivan,* 578 F.2d 121, 122–23 (5th Cir. 1978). This principle has been repeatedly applied by this circuit in cases involving drug conspiracies and substantive drug violations. *E. g., United States v. Sullivan, supra; United States v. Decker,* 543 F.2d 1102, 1103–04 (5th Cir. 1976), *cert. denied sub nom. Vice v. United States,* 431 U.S. 906, 97 S.Ct. 1700, 52 L.Ed.2d 390 (1977); *United States v. Apollo,* 476 F.2d 156, 162

(5th Cir. 1973). It should be no less strictly applied to hold the organizer or supervisor of a criminal enterprise responsible for the acts of his co-conspirators done in furtherance of the operation he manages. The *Pinkerton* vicarious-liability rationale is based upon an agreement or common purpose shared by co-conspirators; they are partners in crime, and the act of one in furtherance of the unlawful plan is the act of all. *Pinkerton v. United States,* 328 U.S. at 646–47, 66 S.Ct. 1180. This element is also present in the offense set out in 21 U.S.C. § 848—conducting a continuing criminal enterprise—of which Belmares was convicted. The statute requires that a defendant must act "in concert" with five or more persons. The Supreme Court and this court have interpreted this to encompass the agreement required to prove a conspiracy. *Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977); *see United States v. Johnson,* 575 F.2d 1347 (5th Cir. 1978). Therefore, we hold *Pinkerton* and its progeny equally applicable to defendants charged with either conspiracy to violate the drug laws or a section 848 continuing criminal enterprise. The appellate inquiry is whether the government offered sufficient proof that a jury might reasonably conclude that an agreement or common purpose to violate the Drug Control Act existed. If this concert of action has been proved, all members of the enterprise, including the organizer, manager, or supervisor, are responsible for the substantive offenses committed by each member during the course of and in furtherance of the plan. Appellant Jones' two importation offenses charged in counts 10 and 13, convictions we today affirm, were unquestionably committed to further the group's illegal scheme. Belmares, as supervisor, shares equal responsibility for those offenses, and we likewise affirm his two convictions for the two acts of importation alleged in counts 10 and 13.[13]

---

**13.** We are mindful of the rule that a conviction can not be affirmed on appeal on a theory not presented to the jury. We believe, however, that the charge fairly presented the *Pinkerton* principle to the jury. The trial court instructed the jury on two occasions in its final charge that after they were satisfied beyond a reasonable doubt that a conspiracy existed and that a defendant was one of the members of it, then that defendant assumed the responsibility for

### Conducting a Continuing Criminal Enterprise

■ Appellant Belmares complains that his conviction for conducting a continuing criminal enterprise in violation of 21 U.S.C. § 848 cannot be affirmed because the evidence is insufficient to support a conviction. Central to this argument is his related contention that there is no evidence to convict him of the substantive importation offenses alleged in counts 10 and 13.

■ A person engages in a continuing criminal enterprise, as defined in 21 U.S.C. § 848(b)(2), if he violates the Drug Control Act in a continuing series of such violations (a) which are undertaken by such person in concert with five or more other persons with respect to whom such person occupies a position of organizer, a supervisory position, or any other position of management, and (b) from which such person obtains substantial income or resources. Belmares does not contend the government failed to prove he obtained substantial income from the operation but does, however, attack proof of the other statutory elements. First, he asserts that there is no proof he supervised or acted in concert with five or more persons engaged in a smuggling operation. He characterizes himself as no more than an equal participant in isolated smuggling ventures and suggests that he was convicted solely because he appeared to be of Mexican descent. This argument is frivolous. No fewer than seven government witnesses testified that all or part of their involvement in smuggling marijuana was under the direction and supervision of Bel-mares. These witnesses also testified that others, including his co-defendants, were working for him as well. The government clearly proved that Belmares acted in concert with five or more persons [14] and occupied a position of supervisor, manager, or organizer with respect to these persons.

Belmares next contends that the government failed to prove a continuing series of violations of the Drug Control Act. Count 2 of the indictment charged Belmares with a "continuing series of violations consisting of the offenses charged in counts 1, 5, 10, 11, 12, 13, and 16." The trial court charged the jury that a conviction on count 2 was dependent on their finding beyond a reasonable doubt that Belmares committed three or more of the offenses charged in the above counts.[15]

■ Belmares was convicted on six counts—conspiracy to import marijuana, a continuing criminal enterprise, and four substantive importation offenses. He does not challenge his convictions for two of the substantive offenses (counts 4 and 5). He argues, however, that no evidence supports his convictions for importation alleged in counts 10 and 13 and that they cannot be used as a basis for a section 848 conviction. He further asserts that the conspiracy conviction cannot be used because it is a lesser-included offense to conducting a continuing criminal enterprise. Thus, his argument continues, the verdict is reduced to valid convictions on only two substantive counts and the conviction for a continuing criminal enterprise must fall. We agree, as we

the acts and statements of all other members made in furtherance of the conspiracy.

14. The requisite five persons need not act in concert at the same time. *United States v. Bolts,* 558 F.2d 316, 320–21 (5th Cir. 1977), cert. denied, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1978).

15. We note that few cases have considered the exact meaning of the term "continuing series of violations." Those that have done so require three or more violations, but less clear is what constitutes a "violation" for purposes of section 848. Appellant Belmares argues that three *convictions* are required, but some courts have apparently allowed proof of an overt act in violation of the drug laws to suffice, even though it was not the basis for a separate substantive count. *See United States v. Johnson, supra; United States v. Fry,* 413 F.Supp. 1269 (E.D.Mich.1976), aff'd, 559 F.2d 1221 (6th Cir. 1977); *United States v. Bergdoll,* 412 F.Supp. 1308 (D.Del.1976); *United States v. Collier,* 358 F.Supp. 1351 (E.D.Mich.1973), aff'd, 493 F.2d 327 (6th Cir.), cert. denied, 419 U.S. 831, 95 S.Ct. 56, 42 L.Ed.2d 57 (1974). We need not decide this question, however, because the government has agreed, for purposes of this appeal, that three convictions are required to support Belmares' section 848 conviction.

must, that conspiracy to import marijuana is a lesser-included offense to conducting a continuing criminal enterprise. *Jeffers v. United States, supra; United States v. Johnson, supra.* We express no opinion on whether proof of the conspiracy could be used to support Belmares' section 848 conviction because we have held that he was properly convicted on counts 10 and 13. Thus, a continuing series of violations was proved, and Belmares' count 2 conviction is affirmed.

▋ We must, however, modify the judgment. Because conspiracy to import is a lesser-included offense to conducting a continuing criminal enterprise, it cannot support a separate conviction and sentence.[16] *Jeffers v. United States, supra; Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); *United States v. Buckley,* 586 F.2d 498 (5th Cir. 1978); *United States v. York,* 578 F.2d 1036 (5th Cir. 1978). The proper remedy for convictions on both greater and lesser offenses is to vacate both the conviction and the sentence of the lesser-included offense. *United States v. Buckley, supra; United States v. Newman,* 468 F.2d 791 (5th Cir. 1972), *cert. denied,* 411 U.S. 905, 93 S.Ct. 1527, 36 L.Ed.2d 194 (1973). Therefore, we vacate Belmares' conviction and sentence for conspiracy to import marijuana (count 1), but there is no need to remand for resentencing because it is clear that the conviction for conspiracy did not lead the trial court to impose a harsher sentence on the greater offense than he would have in the absence of the lesser conviction. *United States v. Buckley, supra.*

### Extraneous-Offense Evidence and Severance

Each appellant argues that the trial court erred in allowing an immunized witness, Douglas Spitler, to testify concerning marijuana flights he made during the early months of 1976. They contend that these trips were flown as part of a completely separate conspiracy operating in West Texas and New Mexico and that evidence of these extraneous offenses should have been excluded. They point out that these acts were committed by persons who had not yet joined Belmares and contend that no evidence connected these acts of importation to any defendant on trial. Thus, they argue strenuously that each was prejudiced by admission of evidence of the Spitler trips and further assert that they were prejudiced by the spillover effect of the massive amounts of evidence introduced in this complex case involving multiple defendants and multiple counts. The crux of this argument is that the jury was necessarily confused and was unable to keep separate the evidence admissible against individual defendants. Each appellant concludes that reversible error was committed by the trial court's failure to protect them from the spillover effect of the evidence admissible only against other defendants and by his failure to grant their repeated motions for severance.

▋ We begin our consideration of this point by recognizing the general rule that persons who are indicted together should be tried together. *United States v. Morrow,* 537 F.2d 120, 136 (5th Cir. 1976), *cert. denied,* 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). Appellants were properly joined under Federal Rule of Criminal Procedure 8(b) because they were "alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses."[17] Therefore, disposition of the various motions to sever under F.R.Crim.P. 14[18] was within the discretion of the trial

---

16. Appellant Belmares complains that the trial court erred in failing to instruct the jury that he could not be convicted of both conspiracy and conducting a criminal enterprise. The instruction was requested and was erroneously refused. Belmares apparently did not object to the court's failure to instruct the jury as he requested, but in any event, our disposition of the conviction and sentence makes consideration of this alleged error unnecessary.

17. Appellant Belmares contends that there was also a misjoinder of offenses. This contention is without merit. F.R.Crim.P. 8(a).

18. The rule provides as follows:

court. We will not reverse the trial court's refusal to grant severance unless abuse of discretion is shown, and appellants have the heavy burden to show that prejudice resulted from the joint trial. *United States v. Morrow, supra; United States v. Perez, supra.* We require that the prejudice be of the most compelling sort against which the trial court will be unable to afford protection. *Tillman v. United States,* 406 F.2d 930, 935 (5th Cir.), *vacated on other grounds,* 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969).

It is appellants' contention that the requisite prejudice resulted from Spitler's testimony concerning flights made for the New Mexico/West Texas conspiracy prior to its association with the Belmares group. The government concedes and the evidence shows that prior to May of 1976 two separate and distinct conspiracies, each involving co-indictees or co-defendants in this case, were importing marijuana into the United States. Belmares, Jones and Michel were in an ongoing operation with a source of high-grade marijuana in Oaxaca, Mexico, with its distribution situs in Dallas. A separate group, headed by Wood and McVey, with whom Spitler worked as a pilot, were importing a lower grade commercial marijuana into West Texas and New Mexico. A May 1976 attempt by Belmares to recruit Spitler for his enterprise failed, but Spitler did agree to introduce Wood to Belmares. The two men met in Belmares' apartment and agreed to join forces for their mutual benefit.

This alliance is best viewed as a merger of two independent smuggling groups with identical illegal purposes. Each group joined the other and formed an expanded enterprise to continue the importation plans of each. Belmares supplied the contact for high-quality marijuana that Wood needed; Wood supplied the capital,

aircraft and pilot that Belmares needed. No less than four members of the Wood group, including co-defendant Malone, stayed with the expanded organization until the ill-fated December 9 trip. Hines and Henshaw joined after the two groups merged. When one knowingly joins a conspiracy in progress he is responsible for acts of the conspiracy occurring before or after his association with it. *United States v. Dearden,* 546 F.2d 622, 625 (5th Cir.), *cert. denied,* 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977); *United States v. Brasseaux, supra; Nelson v. United States,* 415 F.2d 483, 486 (5th Cir. 1969), *cert. denied,* 396 U.S. 1060, 90 S.Ct. 751, 24 L.Ed.2d 754 (1970). It is clear that the Wood group knowingly joined Belmares' marijuana-importation conspiracy. Therefore, the prior acts of the Belmares group in furtherance of their importation scheme were also attributable to Wood and his associates. It is equally clear that Belmares' group knowingly joined Wood's importation conspiracy and in so doing became responsible for the Wood group's prior acts in furtherance of their importation scheme. The expanded conspiracy shared a marijuana source in Oaxaca, landing strips in South Texas, aircraft, pilots, ground crews, and funds. Because two conspiracies with an identical illicit purpose merged into one in order to more effectively achieve success, evidence of prior acts of each group in furtherance of that purpose was properly admitted against all members of the two groups.

Moreover, the trial court's instructions provide the best safeguard against prejudice resulting from improperly cumulated evidence. *United States v. Morrow, supra.* Where, as here, the government charges several defendants with conspiracy and numerous substantive counts, the possibility always exists that the jury might cumulate the evidence introduced

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires. In

ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection *in camera* any statements or confessions made by the defendants which the government intends to introduce in evidence at the trial.

against all to find guilty a defendant whose connection was only marginal. We are convinced, however, that the instructions given by the trial judge in this case were adequate to minimize the possibility of cumulation of the government's evidence. He charged the jury twice before trial and again in detail in his final instructions to give "separate and personal consideration to the case against each individual defendant." This general admonition was repeated more specifically in the court's charge regarding responsibility for acts and statements of co-conspirators. In addition, he gave clear and thorough instructions concerning the government's burden of proof and the elements required for a conviction on each count. Appellants must show more than that they may have had a better chance at acquittal had they been tried separately or that more evidence was introduced against certain of them than others. No abuse of discretion was committed by the trial court in denying appellants' motions for severance. *United States v. McLaurin*, 557 F.2d 1064 (5th Cir. 1977), *cert. denied sub nom. Bryant v. United States*, 434 U.S. 1020, 98 S.Ct. 743, 54 L.Ed.2d 767 (1978); *United States v. Morrow, supra; United States v. Crockett*, 514 F.2d 64 (5th Cir. 1975); *United States v. Perez, supra.*

### Conclusion

We have carefully examined appellants' remaining contentions and, finding no reversible error, we reject them.[19] Accordingly,

**19.** Among the remaining contentions are two about which we shall comment briefly. Jones and Michel call our attention to an earlier prosecution by the State of Texas for acts that were part of transactions for which they were convicted below. They assert that this subsequent prosecution by the federal government following the state prosecution is in violation of the *Petite* policy of the Justice Department. They would have us reverse their federal convictions because of this violation. We need say only that the *Petite* policy, an internal policy of the Justice Department, is not to be enforced against the government. *United States v. Nelligan*, 573 F.2d 251, 255 (5th Cir. 1978).

Appellant Hines argues that the trial judge abused his discretion in imposing sentence

(1) The conspiracy convictions (count 1) of appellants Jones, Michel, Henshaw and Hines are AFFIRMED.

(2) The conspiracy conviction (count 1) and sentence of appellant Belmares are VACATED.

(3) The conviction of appellant Belmares for conducting a continuing criminal enterprise (count 2) is AFFIRMED.

(4) The convictions of appellants Belmares, Jones and Michel for importation of marijuana (count 10) are AFFIRMED.

(5) The convictions of appellants Belmares and Jones for importation of marijuana (count 13) are AFFIRMED.

upon him. He received a sentence of two years imprisonment with a special parole term of three years following his conviction on the conspiracy count. Hines claims he was penalized for electing to go to trial on the charges and complains of the severity of his sentence when compared to that given co-defendant Lallier, who pleaded guilty and was assessed three years probation in lieu of imposition of sentence. The trial judge committed no "arbitrary or capricious action amounting to a gross abuse of discretion" in sentencing Hines, and we decline to modify his sentence. *E. g., United States v. De La Fuente*, 550 F.2d 309 (5th Cir. 1977).